No. 62,196

STATE OF KANSAS, *Appellee*, v. BOBBY G. HARPER, *Appellant.*

(785 P.2d 1341)

Opinion filed January 19, 1990.

*Charles D. Dedmon,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Mona Furst,* assistant district attorney, argued the cause, and *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Bobby Harper appeals his conviction by a jury of one count of burglary, K.S.A. 21-3715. The jury acquitted the

defendant of a charge of theft. The Court of Appeals affirmed the district court in an unpublished opinion filed March 17, 1989. We granted the defendant's petition for review and reverse the conviction.

Sonny Dukes owned and operated Dukes' Diamonds, a complex of softball fields in Wichita. Dukes contracted with Bobby and Kenny Harper, brothers, to pour cement and build a garage adjacent to the softball field. In exchange, the brothers were allowed to field a team for two seasons without paying entrance fees and Dukes was to pay the them $700 for their work. Dukes paid defendant $400 but refused to pay more until the job was completed. The job was to be completed by June of 1986 but, by the end of that ball season in October, only the cement slabs and some of the framing on the garage had been completed. Dukes agreed that defendant did most of the work. When defendant inquired about who would get the free slot for a team in the league during the 1987 season, Dukes informed him that no one would get the slot until the work was completed and then Kenny would be entitled to the slot because the contract was written under the name of Kenny's business.

In addition to the contract discussed above, Dukes hired defendant as the head groundskeeper for the 1986 season. Dukes gave him keys to the entire building to enable him to do the work required by the head groundskeeper. When Dukes realized in the latter part of the season of 1986 that the work to be done by the Harpers would not be completed, he asked for his keys back. When defendant told Dukes that he needed the keys to get his tools, Dukes did not demand that the keys be returned but, instead, allowed him to retain them.

Dukes testified that he gave defendant permission to have access to the whole building when he was running the grounds crew in 1986. He also gave defendant permission to stay at the building overnight to take care of business or if he was too intoxicated to drive. Dukes did not tell defendant in 1987 that he could not stay overnight. Dukes never fired defendant.

In addition to the construction contract and his employment as head groundskeeper, defendant also worked for Dukes as an umpire. In his position as an umpire, defendant kept track of his own hours and was apparently paid on a per game basis. Ac-

cording to defendant, Dukes did not pay him for all of the games that he umpired, did not pay him a $50 bonus for watching the operations while Dukes was on vacation, and did not give him his discount on concessions.

On April 29, 1987, Officer Donald Luther of the Wichita Police Department was driving by Dukes' Diamonds at night when he saw an individual in the clubhouse. After waiting for a back-up, he entered the building but found no one inside. He did notice that a metal filing cabinet looked as if it had been forced open. Outside, the officer noticed someone lying face down near a fence that surrounded the area. Using his flashlight, the officer approached the individual, placed his foot on the individual's back, and told the individual to take his hands out from underneath him. When the individual finally complied, his hands were handcuffed and he was lifted up and placed on his feet. Although the individual's eyes were bloodshot, the officer did not recall indications of intoxication such as the odor of alcohol or unsteady walking. When the officer asked what he was doing there, the person replied that he stayed there and that keys to the place could be found in his pocket. This person was defendant. The officer tried the keys, which opened the locks.

Laying on the ground near defendant were a hammer and a shirt. Defendant testified at trial that the hammer belonged to him and that he had no intention of taking the shirt. He told the jury that he went into the office of Dukes' Diamonds to obtain records to pursue a lawsuit against Dukes to get paid for his work. Defendant believed that the filing cabinet contained the records, which is why he forced it open. He left the building to go to his van to get tools to unscrew the lock of the filing cabinet. He used the shirt to wipe his fingerprints off the filing cabinet and draped it over his shoulder with no intention of taking it. He merely wanted the records to prove his case and was not looking for money. Defendant testified that he had permission to enter the office but admitted he had no permission to take the records.

The jury acquitted defendant of the charge of theft but convicted him of burglary.

While the defendant raises several issues on appeal, the dispositive issue is whether the district court erred in not granting

the defendant's motion for judgment of acquittal. Defendant argues that his motion for judgment of acquittal should have been granted because the evidence presented by the State did not establish that defendant lacked authority to enter or remain in the Dukes' Diamonds office, an essential element of burglary. In ruling upon a motion for judgment of acquittal, a trial judge must determine

" ' "whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." ' " *State v. Lawton,* 241 Kan. 140, 143, 734 P.2d 1138 (1987) (quoting *State v. Nemechek,* 223 Kan. 766, 768, 576 P.2d 682 [1978]).

For a question involving sufficiency of the evidence, the standard of review on appeal is whether the evidence, when viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

Dukes had given defendant a key and permission to enter the building for a variety of reasons. Defendant needed full access to the building while he was head groundskeeper in 1986. The building is also where he stored the tools needed for the construction work at the ball park. In addition to these work-related uses of the building, Dukes had told defendant that he was free to use the building and even to stay all night if he needed to. Defendant testified that this time he entered the building to find employment records to use in suing Dukes for money he believed was owed to him. The jury apparently believed defendant's explanation for his presence in the building and acquitted him of theft of the shirt and hammer found near him when he was arrested.

In concluding that the trial court did not err in refusing to sustain the motion for acquittal, the Court of Appeals relied on a decision by the Illinois appellate courts. In *People v. Hart,* 132 Ill. App. 2d 558, 561, 270 N.E.2d 102 (1971), the court noted that, generally, unlimited consent given to an employee to enter

the premises of an employer is a defense to a charge of burglary. The court continued, stating: "However, concerning the right of an employee to enter premises of the employer, consent, either stated or implied, but limited as to place, time or purpose, is not a defense where entry occurs outside the limitation." Applying this interpretation, the Court of Appeals concluded that the evidence here established that defendant's authority to be on the premises was limited and that he exceeded that authority. The Court of Appeals noted that Dukes "specifically testified that defendant did not have permission to be in the building at 2:00 a.m." Dukes' testimony is enlightening on this point:

"Q [by prosecutor]: Well, did he have permission to be in there at two in the morning?
"A [by Dukes]: That particular night, no.
"Q: Had he before that?
"A: I do recall making a statement the year before that if he needed to get in and to take care of business or, you know, he got—he got where he couldn't drive home because he was intoxicated or something, that he could stay on my couch. I will admit to that. But he didn't have any permission to be there; at that time he damn sure didn't have permission to break in in any locker or my file cabinet."

Other evidence presented by the State indicates that, although in the spring of 1987 Dukes at one time asked for the keys back, he did not insist upon it and allowed defendant to keep them to have access to his tools. In that regard, Dukes testified:

"A. I told him that—told him that I wanted to gather all the keys up because that was just normal procedure I did at the end of the year. So he said he needed them to get in, you know, that was his standard statement, he needed to go—so he could get to the stuff.
"Q. And what did you say to that?
"A. I said, 'Well if it's going to get the contract filled and get my garage built, then—then fine with me.' Because I had to have a garage built because I had some thefts on my groundskeeping things the previous year that they wouldn't insure any additional groundskeeping equipment without a detached garage. That's why I did this thing in the first place.
"Q. How many times did you ask him—do you remember this conversation specifically?
"A. Not specifically.
"Q. Well, how many times did you ask him?
"A. Well, I only asked of the key—I asked to—to complete the contract about every time I saw him.
"Q. What about the keys, though?

"A. Well, I'm sure I probably only said—said it to him once or twice at the most, you know.

"Q. You don't have a specific recollection?

"A. No, I don't.

"Q. Well, what is the certainty that you have that you asked him at all?

"A. Well, it was just standard procedure, I asked everybody. I got—I got the keys back from everyone. The whole deal is—is the fact that I was— since he was my groundskeeper that I'm not there all the time, I have to trust my groundskeepers with my—with my facility to make sure that it's— that it's taken care of and marked and everything's ready to play. And so I extended that trust to—to Bobby that whole summer hoping that—that he could get Kenny to make good their contract between the two of them. And the only leverage I had at the end of the season was the threat of them not playing there the next year."

On cross-examination, Dukes testified:

"Q. You made a statement on direct the, best that you recall you told him to turn in his keys, is that correct?

"A. Yes, ma'am.

"Q. You don't remember telling Bobby to turn in his keys, is that correct?

"A. Specifically making that statement, no."

No evidence indicates that Dukes placed any specific limitations upon defendant's access to the building when he asked for the keys if, in fact, he did.

Although this court is required to look only to the evidence in favor of the verdict to determine whether the State has established beyond a reasonable doubt the element of "without authority," a review of the evidence here shows that the State did not meet its burden. This does not involve a question of weighing the evidence and credibility of different witnesses because the same witness presented all the evidence about defendant's authority to be in the building. Dukes' testimony established that he gave defendant a key and allowed him, in essence, full access to the building at all hours, including the authority to stay overnight. Although Dukes apparently asked for the keys back, he did not receive them and was aware that defendant still retained the keys. Furthermore, Dukes did not restrict defendant's ability to have access to the building by placing any specific limitation upon the access given through the possession of a key. The State's suggestion, by its leading question, and the finding by the Court of Appeals that defendant did not have permission to be in the building at 2:00 a.m. was con-

tradicted in the answer given by Dukes. Defendant did have authority to be in the building at 2:00 a.m. The question raised by the decision by the Court of Appeals is whether the authority to enter a building is negated when entry occurs for an unlawful purpose. We hold it does not.

Defendant had virtually unlimited consent to enter the premises, not only for duties related to his employment but also to sleep if he was intoxicated; but he entered the building specifically to obtain documents to support a lawsuit against Dukes. Based upon this testimony, the Court of Appeals concluded that defendant entered without authority because Dukes did not authorize his entry to take such records. Thus, the Court of Appeals found the evidence presented sufficient to form a basis for guilt beyond a reasonable doubt and upheld the trial court in denying the motion for acquittal and in allowing the jury to decide the issue. In order to uphold this finding, we must hold that an individual who has authority to enter the premises of an employer for numerous reasons, but actually enters for another reason, enters the premises without authority for purposes of burglary. This we decline to do.

The State's reliance on *State v. Fondren,* 11 Kan. App. 2d 309, 314-15, 721 P.2d 284, *rev. denied* 240 Kan. 805 (1986), is misplaced. In *Fondren,* the defendant argued that his entry into a public building, a school, was not unauthorized as long as the entry occurred during regular hours. The Court of Appeals noted that uncontradicted evidence established defendant had no express or implied authority or business in the school because neither he nor any member of his family was currently enrolled. As a former student, the defendant knew the school's policy required one to report to the office upon entering the building. The Court of Appeals concluded that entry into a public building is impliedly authorized only to the extent the entry is consistent with the purpose or business transaction in the building. 11 Kan. App. 2d at 315. The court questioned characterizing the school as a public building, noting that it was clearly distinguishable from other public buildings such as department stores, the capitol building, or an airline terminal. The general public is not invited to school premises for nonspecific, unrelated-to-school purposes. Thus, ample evidence established the element of entry without authority,

which supported the aggravated burglary conviction. The court cautioned that the key to the case "is the defendant's knowingly *entering* the school *without express or implied authority*, with intent to commit a theft." 11 Kan. App. 2d at 316.

Other jurisdictions have also dealt with this issue. Under the "California rule," a defendant's criminal intent upon entry may render the entry "unlawful" under the burglary statute. *People v. Nunley*, 168 Cal. App. 3d 225, 214 Cal. Rptr. 82 (1985). This rule has been criticized by other jurisdictions. For example, the Colorado Supreme Court noted that, under the California rule, "one who enters a building, even with the permission of the owner, but with intent to commit a theft therein, would *a fortiori* be guilty of burglary. *Intent at the time of entry* in Colorado is not the sole element of burglary under our statute . . . ." *People v. Carstensen*, 161 Colo. 249, 251, 420 P.2d 820 (1966). Under the California rule, any theft that occurs inside a building would be elevated to a burglary because no one would authorize entry into the building to commit theft. The Kansas Legislature could have omitted the element that the entry must occur "without authority," making all entries to commit a crime within burglaries. But it did not do so. Therefore, this statute must be construed in a manner that gives meaning to all the provisions. Thus, we reject the per se "California rule."

Defendant urges this court to consider *State v. Collins*, 48 Wash. App. 95, 737 P.2d 1050 (1987), *modified* 110 Wash. 2d 253, 751 P.2d 837 (1988), in which the defendant received permission to enter the victims' home to use the telephone and, after using the phone, assaulted them. The Washington Supreme Court reasoned that the consent to enter was unqualified and the "remains unlawfully" element of burglary cannot be inferred from criminal intent because then the element would become superfluous. Because the legislature is presumed to not have enacted a superfluous element, it must be given content independent of the intent element. Therefore, the "remains unlawfully" element requires independent proof that cannot simply be inferred from intent. Also inferring "remains unlawfully" from the showing of intent would transform every crime committed indoors into a burglary. For these reasons, the court rejected the State's ar-

gument that an otherwise lawful entry or remaining becomes unlawful if accompanied by the necessary criminal intent.

Other jurisdictions have concluded that one who enters a building with permission of the owner cannot be guilty of burglary, even if that entry occurred with the intent to commit a felony, because intent is not the only element of burglary. In *People v. Carstensen*, 161 Colo. 249, defendant was admitted into an apartment to paint, and would continue doing so after the owners left. After the work was completed, the defendant was charged with theft of a television. The trial court concluded that defendant had been given permission to enter the apartment and, therefore, he could not be guilty of burglary. The Supreme Court approved the decision, noting its earlier decision in *Stowell v. People*, 104 Colo. 255, 90 P.2d 520 (1939), where defendant's employer provided him with a key to a warehouse as part of his employment. He was charged with entry into and theft of parcels from the warehouse. The court in *Stowell* noted that defendant had the right to enter the warehouse at the time and in the manner that he did, provided his intent in doing so was lawful. Even though the offense of burglary would occur only if his unlawful intent negated his authority to enter, the court concluded that unlawful intent was not sufficient to raise the status of the offense to burglary, reasoning as follows:

"There is 'no burglary, if the person entering has a right so to do, although he may intend to commit, and may actually commit, a felony, and although he may enter in such a way that there would be a breaking if he had no right to enter.' 9 C.J. 20, p. 1016, § 20. Considering the history of the crime of burglary, and its evolution, this rule appears reasonable and necessary. The common-law crime was an offense against habitation. Its purpose was to give security to the home when it was presumably least protected. Essential elements thereof were an actual *breaking*, in the *night time*, with intent to commit a *felony*. It has been extended by statute in most states to entry in any way, into any kind of building, at any time, for any unlawful purpose. Under the rule of strict construction of statutes in derogation of the common law courts must necessarily be careful not to extend such acts beyond the clear intent of the Legislature. For instance, among the buildings enumerated in our statute are 'schoolhouses.' Hence, but for the rule above stated, a school teacher, using the key furnished her by the district to reopen the schoolhouse door immediately after locking it in the evening, for the purpose of taking (but not finding) a pencil belonging to one of her pupils, could be sent to the penitentiary." 104 Colo. at 257-58.

The court in *Carstensen* stated:

"In our view *Stowell* is still the law and is fully applicable here. We do not agree with the People that the so-called California Rule apparently first announced in *People v. Barry,* 94 Cal. 481, 29 Pac. 1026 (1892), and followed there as recently as in *People v. Deptula,* [58 Cal. 2d 225,] 23 Cal. Rptr. 366, 373 P.2d 430 (1962), is or should be the law in Colorado. To so hold would mean the adoption of a rule that one who enters a building, even with the permission of the owner, but with intent to commit a theft therein, would *a fortiori* be guilty of burglary. *Intent at the time of entry* in Colorado is not the sole element of burglary under our statute (C.R.S. 1963, 40-3-5) as heretofore interpreted by the court." 161 Colo. at 251.

In *State v. Thibeault,* 402 A.2d 445 (Me. 1979), the Supreme Court of Maine rejected the State's argument that, since the defendant entered the apartment for an unlawful purpose of theft, any permission he had to enter would be negated. In so doing, the court noted:

"Since the common law required a 'violation of the security designed to exclude,' it was axiomatic that a person entering with the permission of the lawful possessor could not be guilty of burglary. *E.g., State v. Moore,* 12 N.H. 42 (1841); *Davis v. Commonwealth,* 132 Va. 521, 110 S.E. 356 (1922); 2 R. Anderson, Wharton's Criminal Law and Procedure §§ 414, 442 (1957). As one authority explains,

" '[t]he law was not ready to punish one who had been "invited" in any way to enter the dwelling. The law sought only to keep out intruders, and thus anyone given authority to come into the house could not be committing a breaking when he so entered.' W. LaFave & A. Scott, Criminal Law § 96 (1972).

. . . .

"In other jurisdictions, Maine among them, the word 'breaking' has been eliminated and a word or phrase such as 'unlawful,' 'unauthorized,' or 'without license or privilege' has been inserted in the statute to qualify 'entry.' Where such language has been employed in a burglary statute, the result has generally been to retain so much of the breaking element as required a trespassory entry while at the same time eliminating the illogical rules stemming from the 'force' aspect of breaking. Of course, where the statute requires a trespassory entry, the lawful possessor's consent is a complete defense." 402 A.2d at 447-48.

A statute similar to ours was construed by the Louisiana Supreme Court in *State v. Dunn,* 263 La. 58, 267 So. 2d 193 (1972). The court held that lack of authority had to be determined as a distinct element separate and apart from the intent to steal because the legislature would not have included the word "unau-

thorized" if it intended burglary to include any entry with the intent to steal. 263 La. at 63. Furthermore, in *State v. Rogers*, 83 N.M. 676, 496 P.2d 169 (1972), the court concluded that intent at the time of entry was not the sole element of burglary and, thus, the element of "without authority" had to be proven by the State. See Annot., 58 A.L.R.4th 335 and cases cited therein. The same is true in the present case. The Kansas Legislature clearly intended for the element of intent to commit a felony or theft to be separate and distinct from that of entry without authority.

The Court of Appeals erred here in concluding that entry with the intent to commit a felony or theft necessarily established that defendant exceeded the scope of his authority to enter and proved defendant entered "without authority." The Court of Appeals stated: "If the evidence shows, as it did in this case, that defendant was limited to enter the building for a certain purpose and the only purpose for which he entered the building was to commit a felony or theft, then intent may be used to show lack of authority." For authority, the court relied upon *State v. Schantek*, 120 Wis. 2d 79, 353 N.W.2d 832 (1984). In *Schantek*, the defendant was never given authority to be at the place of his employment after regular business hours or for nonemployment purposes. Although the defendant was not expressly told that his presence was prohibited after hours or for nonemployment purposes, the court in *Schantek* noted that most employer-employee relationships create the implied right of the employee to be on the premises for certain purposes and not for others. The extent of permission is determined under the facts of each case, which may reveal that consent was all-encompassing, strictly limited, or somewhere in between. 120 Wis. 2d at 84. The court recognized the difficulty in defining an employee's permission to be on the premises but concluded that, under the facts in *Schantek*, the employer did not give defendant consent to enter the premises and that the defendant had knowledge of such nonconsent.

Here, defendant's authority to enter the office of Dukes' Diamonds was virtually unlimited. Dukes gave defendant authority to enter the office (1) for his duties as groundskeeper, (2) in his role as an umpire, and (3) for his construction work. But even beyond these employment responsibilities, Dukes allowed de-

fendant to use the office after hours for his personal needs, even spending the night if he was intoxicated. This extremely broad grant of authority to enter and use the office of Dukes' Diamonds was ignored by the Court of Appeals. The authority to enter here must be interpreted as one that was general and not limited to specific employment purposes. The entry by the defendant was authorized and did not become unauthorized because of his criminal intent. Because the authority to enter was virtually unlimited, this evidence would cause a reasonable mind to conclude that a reasonable doubt existed that defendant entered the clubhouse at Dukes' Diamonds without authority. Therefore, the motion for judgment of acquittal should have been granted.

This same question is raised by the defendant's challenge to the instruction given immediately after the elements instruction on burglary, which provides as follows: "Permission to enter a building for a lawful purpose does not extend to entry for an unlawful purpose."

Trial counsel objected that this instruction was irrelevant, but on appeal defendant argues that the instruction is a misstatement of the law. Because the objection at trial did not state the specific grounds for the objection raised on appeal, K.S.A. 22-3414(3), this court can reverse only if the trial court's giving of the instruction was clearly erroneous. An instruction is clearly erroneous when a reviewing court reaches a firm conviction that, if the trial error had not occurred, a real possibility exists that the jury would have returned a different verdict. *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988).

Defendant argues on appeal that this instruction eliminates the element requiring the State to show entry occurred "without authority," because, if someone enters for an unlawful purpose, whether the individual had authority to enter is not an issue. The comments of the Judicial Council, which were made at the time the burglary statute was recommended for enactment by the legislature, note that the elements of burglary consist of "a known entry without authority *and* with intent to commit a felony or theft." (Emphasis added.) Judicial Council Comment (1968) following K.S.A. 21-3716. The language of the statute and the Comment by the Judicial Council indicate that the legislature intended for entry without authority and entry with intent to

commit a felony or theft to be two separate elements, both of which must be proven beyond a reasonable doubt to establish the offense of burglary. Defendant argues that, if entry occurs with intent to commit a felony or theft, under the instruction given by the court, that necessarily means the entry occurred without authority.

The Court of Appeals noted that the challenged instruction "is very close to a per se rule that intent to commit a crime always renders an entry unauthorized." In fact, the instruction informed the jury that entry for an unlawful purpose negates the permission to enter the building for a lawful purpose. The Court of Appeals concluded that it could not say "with firm conviction in this case that, if the instruction had not been given, there was a real possibility the jury would have returned a different verdict." The Court of Appeals points out that defendant testified he did not enter the building for any purpose related to his employment or for business purposes but, instead, to steal papers belonging to the owner. Yet these papers were related to his employment, namely defendant's efforts to be fully compensated by Dukes. The Court of Appeals reasoned:

"Given this clear testimony directly from defendant, the jury could easily conclude he exceeded the scope of his authority to enter the building. It is not important that the reason for entering the building was criminal in nature, but rather that it was not within the scope of authority given to defendant. Based on the clear evidence of lack of authority to enter the building, we cannot conclude the instruction was clearly erroneous."

The problem with this reasoning is that the testimony from defendant did not clearly show that he exceeded the scope of his authority to enter the building. In fact, Dukes testified that he had given defendant complete authority to enter and stay within the building virtually whenever he wanted. Furthermore, the Court of Appeals is wrong in concluding that it is not important that the reason for entering the building is criminal in nature. Based upon the instruction given by the court, it was the "unlawful" nature of this entry that negated his permission to enter the building.

The evidence presented by the State on this case is certainly not overwhelming. The testimony regarding the authority for defendant to be on the premises was based upon that of Dukes and

defendant. Dukes testified that defendant on the one hand was given the key for purposes of fulfilling his employment obligations, but, on the other hand, was given authority to stay at the building virtually whenever he wanted. This contradiction in the testimony of the State's key witness on the authority issue presents a real possibility that the jury could have returned a different verdict if it had been properly instructed. Therefore, the instruction is clearly erroneous and its use constitutes reversible error.

In view of the foregoing, we need not address the other issues raised by the defendant.

The judgment of the Court of Appeals is reversed. The judgment of the district court is reversed and the defendant's conviction for burglary is vacated.

SIX, J., not participating.

MILLER, C.J., dissenting.