No. 79,385

STATE OF KANSAS, *Appellant*, v. PAUL POWELL, *Appellee*.

(971 P.2d 340)

Opinion filed December 11, 1998.

*Julie McKenna*, county attorney, *Christina Pellant*, assistant county attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellant.

*Mike Sheahon*, of Sweet & Sheahon, of Salina, was on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, C.J.: The State appeals from the dismissal of a complaint at a preliminary examination. We have jurisdiction pursuant to K.S.A. 22-3602(b)(1). The proceeding was on a charge of aggravated assault (K.S.A. 21-3410[a]) filed against Paul Conrad Powell, Sr. The district court dismissed the charge on the ground the State had failed to establish probable cause that the offense

had been committed. A second charge of misdemeanor domestic battery (K.S.A. 1997 Supp. 21-3412) alleging defendant's wife was the victim thereof was subsequently dismissed by the State.

## LEGAL STANDARDS

If from the evidence presented at a preliminary examination, it appears that a felony has been committed and there is probable cause to believe that a felony has been committed by the defendant, the magistrate shall order the defendant bound over for trial. K.S.A. 22-2902(3); *State v. Martinez,* 255 Kan. 464, 466, 874 P.2d 617 (1994). If there is not sufficient evidence, the defendant must be discharged. *State v. Engle,* 237 Kan. 349, 350, 699 P.2d 47 (1985); K.S.A. 22-2902(3).

From the evidence presented, the court must draw inferences favorable to the prosecution, and the evidence need only establish probable cause, not guilt beyond a reasonable doubt. *State v. Sherry,* 233 Kan. 920, 935, 667 P.2d 367 (1983). Probable cause at a preliminary examination signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *State v. Allen,* 260 Kan. 107, 110-11, 917 P.2d 848 (1996); *State v. Puckett,* 240 Kan. 393, Syl. ¶ 1, 729 P.2d 458 (1986).

It is not the function of the judge at a preliminary examination to determine the wisdom of the prosecuting attorney's decision to file and pursue the charges against a defendant. Neither is it the function of the judge to conclude there should be no prosecution because the possibility of a conviction may be remote or virtually nonexistent. *State v. Bockert,* 257 Kan. 488, 492, 893 P.2d 832 (1995). See *State v. Whittington,* 260 Kan. 873, 876, 926 P.2d 237 (1996).

In appeals by the prosecution from an order discharging the defendant for lack of probable cause, this court follows the same standard for weighing the evidence as the judge at the preliminary examination. This court is to conduct a de novo review of the evidence when considering the trial court's probable cause finding. *State v. Bell,* 259 Kan. 131, 133, 910 P.2d 205 (1996).

## FACTS

The charges herein grew out of a domestic fracas which occurred on September 25, 1996, on the grounds of defendant's residence. Those involved are defendant (Paul Conrad Powell, Sr.), his wife (Judith Powell), his son (Paul Conrad Powell, Jr.), and his daughter (Lisa Mesa). Lisa had to vacate her home on short notice, and Judith had agreed to the temporary storage of Lisa's furniture in a Morton building located on the senior Powell's property. After Judith and the two siblings started unloading the furniture, defendant came out of the house and became angry over the large quantity of items involved. He hit or hit at his wife. The incident escalated into a physical altercation between father and son. The daughter was so concerned she called 911 (from the Morton building). The tape of the 911 call is a part of the record. We have made the following transcription thereof (blanks are inaudible portions):

"#2: Hi, I need the police bad. Um, my dad's crazy, he's hitting my mom and my brother _____ fight. We're at 4121 North Niles. He's got a bunch of guns out here. I'm trying to get my mom and my brother and we're going to leave. My little sister's in the house, she's only 13. He's got a bunch of guns. Can you please hurry?

"#1: What's the phone number out there, ma'am. You need to calm down.

"#2: Ok, but I can't _____ my dad's _____ got a bunch of guns. He's crazy, he's manic depressive.

"#1: Has he got, has he got any of them out, ma'am.

"#2: What? Paul, wait, don't leave. [crying]

"#3: Clear the cha—

"#1: Ma'am?

"#2: He's using 'em, he's _____ [screaming]

"#3: Clear the channel

"#2: [screaming] No [crying]

"#1: Ma'am?

"#2: He's _____

"#1: Hey ma'am, is there somebody shooting there?

"#2: He's got a gun, he's pointing _____ [crying] No, daddy, please.

"#1: Uh, ma'am, was that a gunshot I heard?

"#2: Yes.

"#1: What you shooting at?

"#2: I gotta go.

"#1: Ma'am, where's he shooting at?"

After the law enforcement officers arrived, the daughter wrote out the following statement:

"Paul Jr, my brother, and I and my mom, Judy, went to 4121 N. Niles rd to unload a truck of boxes in my parents mason building & my dad came out & him and my mom were arguing and my dad hit my mom so my brother told him to quit & then he pushed my brother up againt the truck by the neck & then my brother & my father started fighting my mom & I tried to pull my brother off my dad & I tried to stop my dad from going inside to the house & I had to let go so I went to the phone in the mason building & called 911—my brother got in the truck & told me & mom to get in & I said no cause 911 hadnt answered yet then they answerd & I was talking to them & watching outside I saw my brother in the truck & I saw my dad had a rifle pointed at him & then I think I told 911 I had to go now & I ran through the field to the road & saw the sherriffs car & talked to them."

## PAUL JR.'S TESTIMONY

Asked if something besides the furniture precipitated the ensuing incident, Paul said defendant had "made a slapping motion at my mom enough to, you know, kind of tap, but it wasn't an actual hit." Paul said this upset him and he told defendant not to hit her. It was after the son confronted his father that defendant grabbed him.

Paul testified that he and defendant "got into it a little bit." Defendant pushed him up against the truck after the son had yelled at him. When asked if he remembered defendant grabbing him by the throat, the son responded that defendant "[j]ust pushed me up on my neck." Shortly after that, defendant tripped or fell and Lisa and Mrs. Powell attempted to intervene.

Paul testified that after this altercation he just wanted to leave and tried to get his sister to leave with him. Lisa, however, was on the phone in the Morton building with the 911 dispatcher. Paul also asked his mother if she wanted to leave with him; she said no. Paul got into his truck and started down the driveway. Paul testified about what happened next:

"Well, I was already driving down the road and he [defendant] had stepped out of the house and had a gun and he pointed it at me, or — well, not at me, but at the truck. And when I saw the gun I just ducked down and swerved. I kind of swerved at him because I figured, you know, if I swerve, you know, nothing is going to happen, I'm just going to be able to get out of there and just leave."

Paul said defendant was about 10 feet from the bumper of the truck when this happened. He identified the weapon as a shotgun.

When asked why he ducked down when he saw the gun "pointed at [him]," Paul replied, "Just the gun, I mean, to me, that was insignificant. I had just ducked." When asked what he was feeling when "this gun was pointed at [him]," Paul replied, "That I needed to get out of there. Basically, just, you know, just to get out of there because he was mad and I was mad and I just—that's, basically, all I was thinking, that I had to get out of there." When asked if he was scared, Paul replied, "Not really. Not real scared, but I was—I was very upset." When asked if he thought his father was going to shoot him, Paul responded, "Not really."

When asked on redirect what he would normally think if a person pointed a gun at him, Paul responded, "I believe I would normally think that the person was either trying to rob you or show—I don't know. Do whatever you're going to do. Rob you or threaten you with a gun." Paul testified that no one else was in the truck with him when defendant pointed the gun.

Paul said when he left the scene he decided to stop at his aunt and uncle's house and tell them what had happened. Paul was crying and upset. Paul explained that he was emotionally upset because he and his father had never argued before.

Paul agreed that his statement to law enforcement officers, given immediately after the incident, conflicted with his testimony at the preliminary hearing. Paul did not remember telling the deputy that he thought defendant was going to shoot him, adding, "But if I did, you know, I don't feel that he was going to shoot me now, now that I sit back and think about it." He explained further when questioned about ducking: "I don't think he was going to, I can say now, because I think now that he isn't, now that he was—he wasn't planning on it. That's all that I guess I can say." Paul denied that any shots were fired from the gun.

## LISA'S TESTIMONY

Lisa testified that she saw her father yelling at her mother about the furniture but did not see him hit her. When Lisa turned around at some later point she saw her brother and father fighting. She called 911. Lisa said she did not remember telling the deputy that the altercation started when defendant hit Mrs. Powell.

While she was on the phone with the dispatcher, Lisa saw her father come out of the house with a gun. She was not sure what happened next. Defendant stood in the driveway with the gun. When asked if she saw defendant point the gun at her brother, Lisa replied,

"I saw it in the air. I'm not sure. You can't tell from the distance that I was what he was aiming at. It was—it was up like this, the way that, I guess, you would normally carry a gun. You don't carry it like that, or like that. Like this. I don't know. He just had it in his hands like this."

On cross-examination, Lisa denied hearing any gunshots. Lisa remembered the dispatcher asking her if there was a gunshot, but she did not remember what she told him. Lisa said she was hysterical on the telephone because when defendant came out with a gun she was scared. Lisa testified that her written statement, given right after the incident, was true and correct.

## OTHER TESTIMONY

The dispatcher receiving the 911 call stated he heard two gunshots during the call. After the officers arrived, defendant called the Salina Police Department. Another dispatcher on duty testified he asked defendant "what was going on out there," and defendant responded he guessed that they needed to talk to him. Defendant said he did not shoot at his son but "he was trying to scare him." The dispatcher then told defendant that deputies were outside and he should go outside with his hands on his head.

The State attempted to introduce evidence of a silver nitrate test performed on defendant's hands on the night in question to test for a residue of gunpowder. The court refused to admit the evidence on the strange ground that whether or not defendant had fired a gun during the incident was irrelevant to preliminary examination. The defendant offered no evidence.

## JUDICIAL RULING

The district court ruled from the bench, as follows:

"I have no doubt in [that] the Court's ready to give its ruling with regards to Count 1 on the aggravated assault violation of K.S.A. 21-3410, that some type of altercation took place at 4121 North Niles Road, but the victim in this case, Paul Conrad Powell, whether he's telling the truth now or whether he was telling the

truth then, definitely states under oath today that he was not in reasonable apprehension of immediate bodily harm regardless of whether or not Paul Conrad Powell, Senior was holding a weapon or not. That element being missing, the Court has no recourse but to find that the State has failed for the purposes of preliminary examination to meet one of the essential elements and the Court finds that no crime has been committed with regards to the charge that is before the Court today."

## DISCUSSION

K.S.A. 21-3410(a) provides "[a]ggravated assault is an assault, as defined in K.S.A. 21-3408 and amendments thereto, committed . . . [w]ith a deadly weapon." Assault, as defined in K.S.A. 21-3408, is "intentionally placing another person in reasonable apprehension of immediate bodily harm."

The district court dismissed the complaint finding there was no probable cause to believe that aggravated assault had been committed. Specifically, because Paul had testified that he was "not real scared" by his father's conduct with the gun, the district court did not believe the State had presented evidence on all the elements of aggravated assault.

The State argues that the district court ignored the evidence. Paul's actions on the evening of the altercation showed he was in apprehension of immediate bodily harm. According to the State, the evidence presented at the preliminary hearing indicated that Paul ducked and swerved when he saw his father point the gun at him and fire two shots from a distance of about 10 feet. Such apprehension was a reasonable response to the circumstances.

Defendant contends that the State completely ignores Paul's testimony. Specifically, defendant contends that Paul "consistently testified that he was not frightened nor was he in reasonable apprehension of bodily harm."

The parties to this appeal each rely on *State v. Nelson*, 224 Kan. 95, 577 P.2d 1178 (1978), for support of their respective positions.

In *Nelson*, the defendant was convicted of aggravated assault with a deadly weapon (K.S.A. 21-3410[a]). The defendant fired a revolver three times at a passing car which James Smith, defendant's boyfriend, was driving, hitting the car three times. Smith was in the car with a woman. Smith stopped the car, got out, and started

walking toward the defendant. An officer at the scene approached the defendant from the opposite direction. The defendant fired a fourth shot in Smith's direction. Smith and the officer converged on the defendant; Smith reached her first and struggled for the gun; the gun discharged a fifth time into the pavement. Defendant was arrested at the scene. Defendant was hysterical and screaming, saying she was in love with Smith but was going to kill him. 224 Kan. at 95-96.

At trial, Smith was subpoenaed as a witness but failed to appear. Defendant was found guilty. Her conviction rested entirely on the testimony of the officer at the scene. Smith's actions, as described by the officer, indicated a lack of fear for his (Smith's) own safety. On appeal, defendant contended that there was no evidence presented to prove that Smith was placed in immediate apprehension of bodily harm. 224 Kan. at 96.

We rejected Nelson's argument, holding:

"There can be little doubt an attempt to do bodily harm was coupled with the apparent ability to injure Smith. Even though the defendant fired wide of the mark on all five occasions we believe questions as to her intention and his fear of bodily harm were properly left to the jury. See *State v. Clanton*, 219 Kan. 531, 548 P.2d 768 (1976), and *Gornick v. United States*, 320 F.2d 325 (10th Cir. 1963). The elements necessary to establish a crime may be proved by circumstantial evidence. See *State v. Wilkins*, 215 Kan. 145, Syl. ¶ 4, 523 P.2d 728 (1974), and *State v. Colbert*, 221 Kan. 203, Syl. ¶ 2, 557 P.2d 1235 (1976)." 224 Kan. at 96.

Here, the State contends that, like *Nelson*, circumstantial evidence was presented and the question was one that should have been properly submitted to a jury. On the other hand, defendant contends that the State's reliance on *Nelson* is misplaced. Specifically, in *Nelson*, four shots were actually fired in the direction of the victim and this evidence, coupled with the officer's testimony, established the element of reasonable apprehension of immediate bodily harm by circumstantial evidence. In this case, defendant argues, his son's testimony at the hearing should be controlling on this element as he was the alleged victim and his testimony did not support binding defendant over for trial.

It should be noted that *Nelson* is distinguishable in that it is based on an appeal from a conviction. This case before us involves

an appeal from the dismissal of a complaint. When the sufficiency of the evidence supporting a conviction is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997). However, as previously stated, when the State appeals the district court's dismissal of a complaint, we conduct a de novo review searching for evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. Thus, the State need only present evidence of probable cause; evidence to support guilt beyond a reasonable doubt is not required.

Notwithstanding the significant differences in the applicable standards of review, the facts in *Nelson* are similar to those herein. In both cases, the apparent victim of the aggravated assault either did not testify or gave testimony minimizing or negating feeling immediate apprehension of bodily harm. In both cases, the State presented circumstantial evidence to support a conclusion that the victim was in immediate apprehension of bodily harm. Here, the 911 caller, defendant's daughter, Lisa, indicated that a gun had been fired. The dispatcher heard two shots. Additionally, Lisa gave a written statement indicating that defendant had pointed a rifle at her brother. Another dispatcher testified that defendant told him he was trying to scare his son. Finally, the son testified he ducked and swerved when he saw defendant pointing the gun at the truck which he was driving.

Defendant contends that the district court's dismissal was consistent with this court's holding in *State v. Warbritton*, 215 Kan. 534, 527 P.2d 1050 (1974). There, the defendant was convicted of aggravated battery against his wife and aggravated assault upon his mother-in-law. Defendant's mother-in-law was holding defendant's infant when he took a gun off the wall and pointed it at her. On appeal, Warbritton argued that the evidence was insufficient to establish aggravated assault. 215 Kan. at 534-35.

At trial, defendant's mother-in-law testified that she did not fear for her own safety and that she did not think the defendant would

hurt her. She said she knew because of the way she was holding the baby he would hit it instead of herself if he pulled the trigger. We held that "[i]n the face of positive testimony such as this we cannot say, as urged by the district attorney, that the circumstances were such that, as a matter of law, Mrs. Bailey had fear for herself." 215 Kan. at 538. Defendant's conviction for aggravated assault was reversed. 215 Kan. at 538. As the opinion does not discuss relevant circumstantial evidence, we must assume there was none.

Again, *Warbritton* is distinguishable because it was an appeal of a conviction, not an appeal of the dismissal of a complaint. Accordingly, a far stricter standard of review is required when determining a sufficiency of evidence question.

In the case before us both siblings testified at the preliminary examination. Each downplayed the severity of the incident as opposed to their actions and statements at the time the events were transpiring. This is certainly not uncommon where charges arising from domestic disturbances come before a court. Family members often draw together to minimize the incident.

A somewhat similar situation occurred in *State v. Whittington*, 260 Kan. 873, 926 P.2d 237 (1996). There, Whittington's wife, Judy, became angry with him at a party. Whittington got into his vehicle and at one point drove forward and knocked Judy to the ground. Whittington was charged with aggravated battery. An officer at the scene interviewed Judy and other people at the party. Whittington told the officer they had had a " 'domestic' dispute," and Judy had told Whittington he should leave. Judy said as he was attempting to leave, she stepped in front of the Blazer and he drove forward to scare her.

At the preliminary examination, the State called Judy, the officer, and two other guests at the party. Judy testified that the vehicle was on wet grass and skidded when it hit her because Whittington had tried to stop before he slid into her. One witness testified that she thought Whittington was only trying to scare Judy although she did not hear anything that sounded like braking before Judy was hit. One witness testified that Judy ran in front of the vehicle and it slid about a foot before it struck Judy. This witness did not think Whittington deliberately hit Judy. After both sides had presented

evidence, the district court judge recalled Judy and asked her if she was " 'not real' excited about having her husband charged with a felony." 260 Kan. at 875. She answered that she was not. The district court dismissed the complaint finding that such a felony prosecution would have " 'a very disruptive effect on a marital relationship.' " 260 Kan. at 876.

We reversed, holding: "When there is a conflict in testimony at the preliminary examination, a question of fact exists for the jury, and the magistrate must draw the inference favorable to the prosecution. [Citation omitted.]" 260 Kan. at 877. The testimony about Whittington's movements in and out of the vehicle was conflicting and, while there was no direct testimony that Whittington was acting in a rude, insulting, or angry manner when his vehicle hit Judy, the movement of the vehicle suggested that he may have been so acting. When viewed in a light most favorable to the State, the evidence was sufficient to bind Whittington over for trial. Further, citing *State v. Puckett*, 240 Kan. 393, Syl. ¶¶ 4, 5, 729 P.2d 458 (1986), we reiterated that a criminal action is between the State and the accused, and the wishes and actions of the victim do not control whether a prosecution should be pursued. When the State has established the necessary probable cause at a preliminary examination, it is the duty of the judge to bind the defendant over for prosecution regardless of the wishes of the alleged victim or the personal assessment of the judge as to the merits of the action. *Whittington*, 260 Kan. at 879.

The district court had a duty to consider more than the son's testimony at the preliminary examination. Drawing all inferences favorable to the prosecution from the evidence presented, as is required, we conclude the evidence is sufficient to support a finding of probable cause that the defendant committed the offense of aggravated assault as charged herein. The district court erred in refusing to bind the defendant over on aggravated assault.

The case is reversed and remanded to reinstate the aggravated assault charge against the defendant and for further proceedings in conformity with this opinion.

Reversed and remanded with directions.