No. 83,091

STATE OF KANSAS, *Appellant,* v. KARIM ABDUL ISMAILI,
*Appellee.*
(7 P.3d 236)

Opinion filed
June 2, 2000.

*Rick A. Fleming,* special assistant attorney general, of Office of the Securities Commissioner, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellant.

*Robert V. Eye,* of Irigonegaray & Associates, of Topeka, argued the cause, and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This K.S.A. 17-1253(a) securities fraud case concerns a preliminary examination probable cause determination. The district court, reasoning that the State failed to present sufficient evidence to bind Karim Abdul Ismaili over for trial, dismissed the complaint. The State appeals. The State's charge against Ismaili arises out of a series of financial transactions involving interests in

"gas and coalbed methane" drilling leases. Ismaili allegedly made misrepresentations in securing loans from one party to another party without disclosing his personal interest in the transactions.

Our jurisdiction is under K.S.A. 22-3602(b)(1) (appeals may be taken to the Supreme Court as a matter of right from an order dismissing a complaint, information, or indictment). K.S.A. 1999 Supp. 22-3602(b)(1) now directs these appeals to the Court of Appeals (effective July 1, 1999). The dismissal here occurred March 25, 1999; thus, the new law does not apply.

We find probable cause and reverse. The district court erred in dismissing Count I of the complaint (securities fraud).

The State also contends the district court erred by denying the State's motion to amend the complaint to add a second count of securities fraud. See K.S.A. 22-3201(e). The district court denied the State's motion to amend for the same reason it dismissed Count I. The denial of an amendment to a complaint is not appealable under K.S.A. 22-3602(b)(1); thus, the amendment issue is not before us.

## FACTS

The State filed a complaint charging Ismaili with one count of securities fraud, K.S.A. 17-1253(a), and one count of property theft, K.S.A. 21-3701. The charges arise out of Ismaili's involvement in facilitating financial transactions between a buyer and seller of gas lease interests. Because of the district court's finding of insufficiency, we recite the facts in detail.

Bertrand and Clara Grannemann were retired and living in Hepler, Kansas. They initially invested $100,000 in an oil and gas project with Jet Drilling, L.L.C. (Jet), located in Arizona. The investments occurred between December 1995 and April 1996 in three separate transactions. The Grannemann's spent another $110,000 attempting to sell back their initial investment. They made the initial $100,000 investment after individuals at Jet, Robert Cornell (president) and Robert Taylor (vice president), contacted them. Mr. Grannemann described Cornell and Taylor as "salesmen."

The Grannemanns first purchased one $40,000 unit of a Jet offering called the "Carra Lease." They later purchased two more interests. They paid $40,000 for the second and $20,000 for the third. The third unit was sold at "half price." Thus, the Grannemann's owned three $40,000 interests totaling $120,000; however, their actual initial investment was only $100,000.

On May 24, 1996, the Grannemanns received a letter from Jet (Cornell) saying a German investor named Harald Goossens wished to buy out some Jet investors, including the Grannemanns. They tentatively agreed with Taylor to sell their $100,000 ($120,000) interest to Goossens for $127,000. They did not speak directly with Goossens about the sale. On June 6, 1996, the Grannemanns received a written confirmation from Jet (Cornell) stating Goossens agreed to buy their $120,000 interest. The letter also said: "For an additional investment of $40,000, Harald Goossens will pay you $200,000 (Backed by a $5,000,000 Promissory Note) on or before 7/30/96. As a backup to further ensure this additional investment should Harald Goossens not pay you the $200,000, Jet Drilling will give you three units in a lease comparable to the Carra and 40,000 shares of company stock." At some point, the Grannemanns were advised that Goossens needed to resolve an undisclosed $140,000 obligation before he could buy their Jet interests. Mr. Grannemann was told (by either Cornell or Taylor) that Goossens had $100,000 but needed to borrow an additional $40,000. Goossens was willing to pay five times that amount to get the money on short notice.

The date of the Grannemanns' first contact with Ismaili is unclear. However, at some point Taylor suggested Mr. Grannemann contact Ismaili as an "arbitrator" to help Grannemann decide what to do. Grannemann thought he recalled Taylor transferring him to Ismaili during a phone conversation. Grannemann spoke with Ismaili over the phone on several occasions. Grannemann described the nature of those conversations as follows:

> "Well, the first time I think I talked to him was when Goossens wanted to buy our three units and we didn't know whether we should sell our units or not. We weren't very happy with the way Jet was paying us and I was talking to Robbi

Taylor, you know, and when he said he had an arbitrator if I wanted to talk to him I said, yes, I would . . ."

Grannemann testified, "I asked [Ismaili] if he knew both Goossens and Robert Cornell and he advised us to get away from Robert Cornell and go with Goossens." Ismaili suggested that the Grannemanns proceed with the sale and additional loan to Goossens, but advised Grannemann to get a promissory note for the $40,000 loan.

On June 12, 1996, the Grannemanns sent a $40,000 check to Jet. They understood that they were lending Goossens $40,000; however, they were instructed to send the money to Jet, which would then give it to Goossens. Bank records revealed that Jet cashed the $40,000 check but did not then give Goossens $40,000. Instead, the same day the $40,000 check was deposited into the Jet account, a $35,000 check was sent by Jet to Ismaili. According to Grannemann, the $40,000 was to be paid to Goossens. In return, Grannemann received a promissory note for $320,000 from Goossens' company, Powerhouse L.L.C., (purporting to be a Nevada corporation) dated June 7, 1996, and signed by Goossens. The promissory note provided that the $40,000 loan was to be repaid in the amount of $200,000 by July 30, 1996. With the addition of the $127,000 purchase of the Jet interests, the total of the promissory note should have been $327,000. Grannemann testified the $320,000 figure was incorrect. Attached to the promissory note was a document in French that was to serve as collateral. (The document bore a stamp of the Minister of Justice of the Republic of Haiti.)

The Grannemanns subsequently learned that Goossens could not come up with the other $100,000 to meet his undisclosed $140,000 commitment. The Grannemann's were then asked to lend Goossens an additional $70,000. On July 11, 1996, Goossens and Ismaili came to the Grannemann home in Kansas. Ismaili acted as a mediator and was to receive $1,000 each from Grannemann and Goossens. Goossens asked the Grannemanns to lend him another $70,000 so that the original $127,000 transaction could proceed. The details are unclear, but the Grannemanns' understand-

ing was that: (1) Goossens needed the money to meet the $140,000 obligation, and (2) until that obligation was met, the Grannemanns would not receive their money from the now $327,000 deal. The Grannemanns agreed to lend Goossens another $70,000. Ismaili drafted a "memorandum of understanding" to memorialize the agreement. The $70,000 loan was to be paid back with the previous amounts owing (now totaling $397,000) on August 31, 1996. The memorandum of understanding advised both parties to seek independent counsel.

The Grannemanns were unsure of whether they could come up with the $70,000 in the short time Goossens needed it. Because of this, they post-dated the $70,000 check and made it payable to Ismaili's business called "Out of Court." Ismaili told the Grannemanns he would hold their check until they could raise sufficient funds to cover it. Ismaili would then transfer the funds to Goossens. Ismaili deposited the $70,000 check into his "Out of Court" business account 1 week later on July 18, 1996. Bank transactions did not reveal a $70,000 payment to Goossens from Out of Court.

The August 31 deadline passed without the Grannemanns receiving payment from Goossens. An investigation later revealed financial ties among Ismaili, Cornell, and Goossens that cast doubt on Ismaili's role in facilitating the transactions between the Grannemanns, Cornell, and Goossens. Ismaili is a corporate officer of a company known as Cale & Fulham, Inc. The extent of Ismaili's interest in Cale & Fulham is unclear. Jet owed Cale & Fulham $1.2 million. Ismaili personally negotiated the transaction between Jet (Cornell and Taylor) and Cale & Fulham that produced the $1.2 million debt. When Goossens acquired a substantial interest in Jet, he also assumed the $1.2 million Cale & Fulham debt. Bank records revealed Goossens paid Ismaili $153,000 between June and November 1996.

Ismaili did not testify. When investigators questioned him about the $70,000, he claimed that because the Grannemann's did not free up sufficient funds to cover the check in time to meet Goossens' needs, he loaned Goossens $70,000. Ismaili claimed he used the Grannemann's $70,000 to pay Cale & Fulham on behalf of

Goossens. The Grannemann's knew nothing of the transactions or debt among Ismaili, Cale & Fulham, and Goossens.

Evidence at the hearing shows Goossens offered to pay the Grannemann's $70,000 plus 10% interest. However, Goossens refused to pay the Grannemann's for the original $127,000 lease interests or the $200,000 for the $40,000 loan. Apparently, the leases are now worthless.

## DISCUSSION

We sit as seven Supreme Court justices and conduct a de novo review on the record of a district court's probable cause finding at a preliminary hearing. *State v. Huser*, 265 Kan. 228, 231-32, 959 P.2d 908 (1998); *State v. Martinez*, 255 Kan. 464, 465, 874 P.2d 617 (1994).

K.S.A. 22-2902(3) requires that a defendant be bound over for trial if, from the evidence at the preliminary hearing, it appears that a felony has been committed and there is probable cause to believe the defendant committed the felony.

We have frequently recited the legal standards applicable to a probable cause determination. In *State v. Powell*, 266 Kan. 282, 283, 971 P.2d 340 (1998), we said:

"From the evidence presented, the court must draw inferences favorable to the prosecution, and the evidence need only establish probable cause, not guilt beyond a reasonable doubt. *State v. Sherry*, 233 Kan. 920, 935, 667 P.2d 367 (1983). Probable cause at a preliminary examination signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. [Citations omitted.]

"It is not the function of the judge at a preliminary examination to determine the wisdom of the prosecuting attorney's decision to file and pursue the charges against a defendant. Neither is it the function of the judge to conclude there should be no prosecution because the possibility of a conviction may be remote or virtually nonexistent. [Citations omitted.]"

When there is a conflict in testimony at the preliminary examination, a question of fact exists for the jury, and the judge must draw the inference favorable to the prosecution. *Powell*, 266 Kan. at 292.

The district court concluded that no crime had been committed with respect to Ismaili's role in the transactions. The district judge said:

"I'm having difficulty in determining if a crime has been committed. . . . I will tell everybody that I've got some concern with the defendant's involvement with Goossens and Cornell. I look at the exhibits . . . . [T]he bank records have probably caused my most concern because they do reflect transfers from one account to the other with the three individuals and that looks bad. It looks bad to the Court, has onerous connotation; but on the other hand has there been a crime in this particular instance? If I loaned Mr. Irigonegaray some money to hold essentially in escrow . . . for Mr. Fleming and Mr. Fleming later offers to pay that back to me how have I been aggrieved by the actions of Mr. Irigonegaray and this is the problem that I've got . . . . The evidence I certainly think suggests Mr. Goossens is prepared to pay the money to the Grannemanns, the $70,000 plus the interest. If that's the case then I must find that Mr. Goossens somehow has derived the benefits if not the actual money from the defendant. If he did not, why would he be agreeing to pay the money . . . .

"There's some problems the Court has with the actions of the defendant. Were they necessarily aboveboard; I can't pass judgment on that right now, but I question if there was full disclosure. I question the relationship the defendant may or may not have had with Cornell and Goossens, but I don't find a crime has been committed . . . ."

The State argues that the district court dismissed the complaint because it misconstrued the Kansas Securities Act and misapplied the law to the facts of this case. There were two charges at issue: securities fraud and theft. The State is not appealing the district court's dismissal of the theft count. According to the State, Ismaili's failure to disclose his personal interest in the transactions is sufficient to establish securities fraud under K.S.A. 17-1253(a). The State insists that the district court analyzed both counts in terms of whether Ismaili misappropriated the $70,000, but misappropriation is not an element of securities fraud under K.S.A. 17-1253(a).

The State's argument has merit. The district court's analysis focused on whether Ismaili obtained the benefits of the $70,000. Because of Goossens' offer to repay, the district court concluded Ismaili did not misappropriate the $70,000.

The securities fraud statute, K.S.A. 17-1253, says:

"(a) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
    (1) Employ any device, scheme or artifice to defraud;
    (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) engage in any act practice or course of business which operates or would operate as a fraud or deceit upon any person."

The State contends it must show only that Ismaili failed to disclose material information in connection with the sale of securities. The lack of disclosure alone is sufficient to establish securities fraud under 17-1253(a). Thus, the State contends the district court's emphasis on Goossens' offer to repay the $70,000 is misplaced. We agree.

The failure to disclose material information about the sale of a security is sufficient to find a violation of 17-1253(a). See *State v. Stuber*, 25 Kan. App. 2d 254, 257-58, 962 P.2d 1104 (1998). In that case, Stuber failed to disclose prior criminal convictions involving dishonesty. The Court of Appeals held the omission sufficient to support a conviction under 17-1253(a)(2). 25 Kan. App. 2d at 258. Here, whether Goossens will repay the money is irrelevant in determining whether a crime has been committed under 17-1253(a). "[R]estitution does not nullify prior criminal activity and allow the guilty party to escape prosecution." *Glassey v. Ramada Inn*, 5 Kan. App. 2d 121, 124, 612 P.2d 1261 (1980).

Although the question may be litigated below, Ismaili does not question, for the purposes of this appeal, whether the transactions here involved "securities." As a result, we need find only that he omitted a material fact in connection with the transactions.

The State adduced sufficient evidence to show: (1) that Ismaili failed to disclose his status as a major creditor of Jet and (2) Ismaili's prior business dealings with Cornell and Goossens. Grannemann testified that, had he known these things, he would have acted differently. Jet and Goossens' $1.2 million debt to Ismaili's company made Ismaili an interested party in the transactions between Goossens and the Grannemanns. Ismaili failed to disclose his true status to the Grannemann's in the course of dealings between the parties. These facts were material in that a reasonable investor would consider them important in deciding whether to invest. See *State v. Puckett*, 6 Kan. App. 2d 688, 691, 634 P.2d 144 (1981), *aff'd* 230 Kan. 596, 640 P.2d 1198 (1982).

Although the Grannemanns did not know the nature of Goossens' $140,000 obligation, it was their understanding that Goossens

needed the money to complete the $127,000 purchase of the Grannemann's gas lease interests. Their understanding arose through conversations with Cornell, Goossens, and Ismaili. The Grannemanns were first told they would receive $127,000 for their $100,000 investment. They were then told they would receive the $127,000 only if they came up with another $40,000. Finally, the Grannemann's were instructed that unless they gave Goossens another $70,000, the deal would fall apart.

Ismaili contends he was merely an independent third party. He describes himself as a mere "go-between" and "scrivener" of the memorandum of understanding. Ismaili also argues that the advice he gave Grannemann shows his independent status. Ismaili contends he told Grannemann (1) not to send any more money to Jet; (2) get paid for his original $100,000 investment before lending money to the enterprise; and (3) obtain a promissory note to evidence any loan. Ismaili's representation of the facts is not accurate. Grannemann testified Ismaili told him not to loan the money until he got a promissory note. *Ismaili did not tell Grannemann to get paid for the $100,000 investment first.*

K.S.A. 17-1253(a)(2) requires only that one omit a material fact "in connection with the offer, sale or purchase of any security, *directly or indirectly.*" (Emphasis added.)

There was adequate evidence to suggest Ismaili's involvement was sufficient to bring his conduct within K.S.A. 17-1253(a)(2). There is evidence to support the State's contention that Ismaili was not an independent third-party advisor. Specifically, Taylor transferred Grannemann to Ismaili during a telephone call when Grannemann expressed reservations about proceeding with the $40,000 loan. This suggests Taylor knew Ismaili would help him convince Grannemann to proceed. The "collateral" Ismaili instructed Grannemann to obtain appears to be a Nevada corporation promissory note attached to a Haitian document written in French. Ismaili did not express a concern about this obviously questionable "collateral" to Grannemann in later discussions.

The evidence suggests Ismaili had a role in persuading the Grannemanns to proceed with the $40,000 and $70,000 loans so that the $127,000 securities transaction could be completed.

There was sufficient evidence at the preliminary hearing stage to support a probable cause finding that Ismaili omitted material facts in connection with the sale of securities.

The case is reversed and remanded to reinstate the K.S.A. 17-1253(a) securities fraud charge against Ismaili and for further proceedings in conformity with this opinion.