IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,894

STATE OF KANSAS,
*Appellee*,

v.

QUARTEZ BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

In order to facilitate a meaningful appellate review, the district courts are directed by Supreme Court Rule 165 (2013 Kan. Ct. R. Annot. 265) that they must make sufficient findings of fact and conclusions of law on the record.

2.

A criminal defendant has a constitutional right to the effective assistance of counsel. But the constitutional right to counsel does not give a criminal defendant for whom counsel has been court-appointed, the right to choose which attorney will represent the defendant.

3.

If a defendant seeks substitute counsel, the defendant must show justifiable dissatisfaction with his or her appointed counsel, which can be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.

1

4.

A criminal defendant seeking substitute counsel bears the responsibility of providing an articulated statement of attorney dissatisfaction. The providing of an articulated statement of attorney dissatisfaction by the defendant will trigger the district court's duty to inquire into the potential conflict of interest.

5.

A district court's duty to inquire into a potential attorney/client conflict emanates from its responsibility to assure that a defendant's constitutional right to effective assistance of counsel is honored. The district court's duty to inquire into a potential attorney/client conflict accrues when the court first learns of the potential conflict and that duty does not decay or dissipate through any inaction on the part of the defendant.

6.

The district court's failure to fulfill its duty to inquire into a potential attorney/client conflict of which it has become aware is an abuse of discretion.

7.

A lack of authority for the defendant to enter the building is an element of the crime of aggravated burglary, separate and apart from the element that the entry be accompanied with an intent to commit a felony therein. A lack of authority to enter a building is not refuted simply because the entry door is always unlocked or because persons other than the defendant have been given free access to the building.

8.

In this case, a victim's statement that she felt threatened when the defendant pointed a gun at her and demanded that she get down on the floor was sufficient evidence to support the apprehension of immediate bodily harm element of aggravated assault.

9.

For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

10.

In order for a defendant to be entitled to a reduced charge because he or she acted in the heat of passion, his or her emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation.

11.

For a defendant to be entitled to lesser included offense instructions on unintentional but reckless second-degree murder and involuntary manslaughter, there must be evidence to support a finding that the killing was unintentional.

Appeal from Sedgwick District Court; ANTHONY J. POWELL and GREGORY L. WALLER, judges. Opinion filed August 15, 2014. Reversed and remanded with directions.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Quartez Brown (Quartez) directly appeals from his convictions for felony murder, the alternative charge of second-degree murder, aggravated burglary, and aggravated assault. The charges arose out of an incident in which Quartez, Kevin Brown (Brown), Kiara Williams, and Jalessa Bonner went to the apartment of Otis Bolden, where Quartez and Brown entered the apartment, assaulted Ashley Green with a handgun, and fatally shot Bolden.

Quartez contends:  (1) The district court abused its discretion in not inquiring into the reasons behind his pro se motion for new counsel before allowing its withdrawal outside Quartez' presence and without a hearing; (2) insufficient evidence supported his aggravated burglary, felony murder, and aggravated assault convictions; (3) the district court should have given lesser included offense instructions on voluntary manslaughter, reckless second-degree murder, and involuntary manslaughter; (4) the district court erred in journalizing his second-degree murder conviction as an off-grid crime; and (5) the district court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by considering his prior convictions at sentencing.

Finding that the district court erred in not inquiring before allowing the apparently nonconsensual withdrawal of Quartez' pro se motion for new counsel, we remand on this issue. We also remand for a nunc pro tunc order correcting the severity level of Quartez' second-degree murder conviction. We reject Quartez' remaining claims of error.

4

FACTS AND PROCEDURAL BACKGROUND

The events leading to this criminal prosecution began to unfold in the early morning hours of April 26, 2010, when Williams and Bonner, together with their friend, Rika Evans, left a local club and gathered at Bolden's apartment, along with Reader Watley. After Bonner accompanied Bolden into his bedroom, she interpreted a comment he made as indicating that he had participated with a group of men who had raped her some 2 years earlier. That prompted Bonner to ask to leave the apartment.

Bolden drove the three women—Bonner, Williams, and Evans—to the home of Bonner and Evans on Glendale, albeit Williams would return to Bolden's apartment to stay the night. En route back to his apartment, Bolden picked up Green. Bolden and Green spent the night in his bedroom, while Williams and Watley spent the night on the couch. There was conflicting testimony as to whether there was any sexual activity involving Williams. Watley drove Williams home the next morning.

That same morning, Bonner told her boyfriend, Brown, about Bolden's involvement in her prior rape. Additionally, according to Bonner, Williams told Brown that Watley and Bolden had sexually assaulted her the night before. Brown then called his cousin, Quartez, who came to the Glendale house where the group discussed a course of action. Evans noted that Brown was visibly upset but Quartez was not. Quartez, Brown, Williams, and Bonner left in Quartez' car to go to Bolden's house. Evans and Bonner both testified that they believed the Brown cousins intended to fight Bolden but neither believed the men would kill Bolden. But on the way to Bolden's house, the group stopped at "Drop's" house, ostensibly to pick up firearms.

The Brown cousins were not friends with Bolden and had never been to Bolden's apartment, so Bonner directed them. When the group arrived at the apartment complex,

5

Quartez backed into a parking spot. The Brown cousins left the car and opened the unlocked door to Bolden's apartment. They first encountered Green in the living room and, at gunpoint, directed her to lie on the ground and asked for Bolden's location. Initially, Green thought the men were Bolden's friends that were "playing" with him. Nevertheless, Green was afraid and felt threatened by the cousins' actions. The cousins proceeded to the bedroom indicated by Green, and she heard gunshots, together with the inquiry, "[W]hy did you rape my home girl?" Green then heard a window shatter and saw one of the assailants exit the apartment through the living room. Apparently, Bolden jumped through a bedroom window and attempted to get away, although he would be discovered later on the sidewalk at the complex.

When Bonner saw Bolden limping around the apartment building, she moved to the driver's seat of the vehicle and retrieved the Brown cousins. The group briefly stopped at Drop's house before returning to the Glendale house. Once back at the Glendale house, Bonner asked Brown what happened at Bolden's apartment. He explained that they were just going to talk to Bolden, but it looked as if Bolden was about to reach for something in his side-table drawer, so Brown shot him. Brown said that after his gun jammed, Quartez shot.

Passersby discovered Bolden on an apartment complex sidewalk and summoned emergency personnel, who transported Bolden to the hospital, where he died from multiple gunshot wounds. Bolden had superficial wounds at his genital area and an entrance and exit wound on his left thigh, but the majority of Bolden's gunshot wounds entered his body from the back side.

A crime scene investigation revealed no signs of forced entry into Bolden's apartment. In the bedroom, an investigator found five .25 caliber shell casings, one .45 caliber shell casing, and a Bluetooth earbud that was still blinking. The deoxyribonucleic

acid (DNA) profile found on the earbud was a mixture of at least three individuals, but the DNA of the major contributor was consistent with Quartez' profile. At trial, the State presented three photos from Quartez' cellphone depicting a man presumed to be Quartez wearing a Bluetooth earbud.

Based on these events, the State charged Quartez with first-degree premeditated murder, or in the alternative, first-degree felony murder, aggravated burglary, and aggravated assault. Before his trial began, Quartez filed a pro se motion requesting the district court to appoint him new counsel. The motion was set for a hearing, but on the day the hearing was scheduled, the record indicates that the motion was withdrawn. The record does not indicate who withdrew the motion. The motion is not discussed again on the record until Quartez mentioned it during his sentencing hearing.

A jury found Quartez guilty of first-degree felony murder, second-degree murder as a lesser included offense of first-degree premeditated murder, aggravated burglary, and aggravated assault. The district court did not impose a sentence for the second-degree murder conviction, but at the request of the State and with defense counsel's approval, the district court did not dismiss the second-degree murder conviction. The district court then imposed sentences of 20 years to life imprisonment and postrelease supervision of life for the felony-murder conviction, 34 months' imprisonment for aggravated burglary, and 12 months' imprisonment for aggravated assault, ordering the sentences to run concurrently.

Of the other three participants, Bonner entered a plea, was sentenced, and has not appealed. The other two—Brown and Williams—went to trial, were convicted, and have appeals pending before this court which were heard on the same docket with Quartez' case. However, the three pending appeals raise completely different issues, prompting us to treat them as separate cases.

7

Quartez first argues that the district court abused its discretion in allowing someone to withdraw his pro se motion for new counsel without making a sufficient inquiry into the circumstances prompting the motion. The State does not defend the district court's actions on the merits, but rather it counters with a procedural strategy. Specifically, the State contends that, pursuant to K.S.A. 2013 Supp. 22-3501, Quartez only had 14 days to make his claim for a new trial and that his oral motion at sentencing was too late, depriving the district court of jurisdiction to consider the claim of error, and, thus, precluding our consideration of his complaint.

*Standards of Review*

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *State v. Berreth*, 294 Kan. 98, 109, 273 P.3d 752 (2012).

If we clear the jurisdictional hurdle, we review the district court's inquiry into a potential conflict of interest under the abuse of discretion standard. *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013). That standard is stated as follows:

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The defendant bears the burden of showing that the district court abused its discretion. *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011).

*Analysis*

Before proceeding further, we pause to observe that this case highlights how a cavalier approach to making a record in the district court can impede, if not foreclose, a meaningful appellate review and, thus, needlessly consume scarce judicial resources. In a case from the same judicial district, where the practice is to memorialize rulings on motions with preprinted minute sheets upon which the presiding judge inks a checkmark in a box or two and, perhaps, scribbles a few words of cryptic explanation, we set forth the following cautionary instruction:

> "It is true that to facilitate a meaningful appellate review, the district court *must* make sufficient findings of fact and conclusions of law *on the record*. *State v. Moncla*, 269 Kan. 61, 65, 4 P.3d 618 (2000); Supreme Court Rule 165 (2009 Kan. Ct. R. Annot. 239). This obligation is emphasized in Rule 165, which states in part that '[i]n all contested matters submitted to a judge without a jury . . . , the judge shall state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision.'" (Emphasis added.) *State v. Edwards*, 290 Kan. 330, 335, 226 P.3d 1285 (2010).

Unfortunately, a scant 9 months after the foregoing statement of a district court's obligation to explain its ruling, the Eighteenth Judicial District failed to do so in this case. There is no record that a judge made an oral ruling on the motion's disposition and the written ruling is a checkmark in the box next to the preprinted words, "Withdrawn," on a minute sheet.

What we do know from the record is that, before his trial began, Quartez filed a pro se motion requesting that the district court appoint him a new defense counsel. The motion alleged that there had been a "lack of performance" by current counsel, as well as

a "complete breakdown of communication," whereby current counsel "refus[ed] to communicate 'at any level.'" The motion also alleged that Quartez was filing a complaint against his attorney with the office of the Disciplinary Administrator.

The record also tells us that the motion was set for hearing before District Judge Warren M. Wilbert, to be heard on January 21, 2011. But there is no record of a hearing being held on that date; we only have the minute sheet indicating that the motion was withdrawn. Moreover, the appearance docket lists District Judge Gregory L. Waller as the presiding judge on the hearing date, and the illegible signature affixed to the minute sheet appears to match an earlier order that identified Judge Waller as the signatory. As we have suggested, the minute sheet does not reveal who requested the withdrawal or whether the movant consented to that disposition.

As the State points out, the record does not reveal whether Quartez repeated his complaints about his defense attorney prior to or during his jury trial, which was presided over by yet another judge, District Judge Anthony Powell, who also presided over the sentencing. But at sentencing, when Quartez was specifically asked by the court whether he had anything to say, the following colloquy occurred:

> "THE DEFENDANT: Yes, I would like to say something. The first thing I would like to say—I wrote this down. This is information on the record. December 29th, 2010, I filed a motion to fire my attorney. I was set a court day for this motion on January 21st, 2011. My lawyer then came to see me and pleaded with me not to fire him. I told him that I did not wish to speak with him until court. When my court date came, I never was called to be in the courtroom. My lawyer came in on a later visit and said that the judge withdrew my motion, so this whole time I've been trying to fire him and never got a chance to hear it in front of a judge. I feel with me not given the appropriate— opportunity to fire him, I might have had a greater chance at being—beating my case because he was not working in my favor.
> "MR. [STEVEN] MANK [Defense counsel]: Well, that's news to me, Judge.

10

"THE COURT: Well, Mr. Brown, that's really something. I find your statement to be, with all due respect, outrageous. You have got one of the best lawyers in this community. Mr. Mank is one of the most respected, able defense attorneys—

"THE DEFENDANT: Well—

"THE COURT: Don't speak. Do not speak—that I've had the pleasure to work with. And I think anyone, and you ask any lawyer, and they would say the same thing about Mr. Mank. The fact is, from my observations in court, you got an able defense, I think the best under the facts of the case. The facts are what the facts are, and you're responsible for those facts.

"I think for you to come into this court now on the date of your sentencing and to raise an issue of why—that you wanted to fire your lawyer, I find that to be particularly troubling to this Court. But you have the right to file such a motion and you can make those proper motions if you wish to do so, but I will tell you right now that my observations of defense counsel, that his representation was more than is constitutionally adequate. It was superior in every respect. And it's unfortunate that you seek, even today, even after what you've heard, seek to blame others for your predicament. The only reason that we're here is because of what you did.

"One of the speakers said that you're a follower when leadership was required, and here at the opportunity that I give you to make some amens, you choose once again to be a follower and not a leader, and I find it to be most despicable, with all due respect, sir. What you've done—and the reason I allowed the victims to speak is so you would understand the gravity of the acts that you've done, that you would understand that the things that you've done can't be undone, and it would appear that all that appears to be lost on you and you want to talk about firing your lawyer. I just—I find it incredible. Mr. Mank was appointed to this case. He didn't ask to serve. He was asked by the court to serve. Mr. Mank can go and do private work and get paid far more money for far less hassle, but he agreed to represent you for the minimal amount that the government, that the State pays because he knew that you were entitled to a defense. Unbelievable.

"MR. MANK: Judge, if I may add something for the record. I met with my client last Thursday. We went over the presentence investigation report. We discussed sentencing. None of this was mentioned to me.

11

"THE DEFENDANT: Your Honor, I asked for him to take some of my things and to defend me. Because I have things that I did want him to say that he did not say, and I asked him to file motions that I would need him to file but also—

"THE COURT: You're not the lawyer in this case, are you, Mr. Brown? You're not the lawyer. You don't have legal training. Right?

"THE DEFENDANT: But I also—

"THE COURT: Mr. Mank has the right to decide your trial strategy, not you. He's the one with the legal knowledge. Why do you think that you want to play lawyer?

"THE DEFENDANT: I didn't want to player lawyer, Your Honor. I just wanted him to ask these questions. And I also have an apology to the family also, but I just wanted to bring this forward.

"THE COURT: Mr. Brown, you have the right to file a motion, an action alleging ineffective assistance of counsel after your appeals are exhausted. Once your appeals are exhausted, you have a year from that time to file any ineffective assistance of counsel claims that you wish to do. So I'll just advise you of your right to do that, and if you wish to do it at that time you can do it."

*Jurisdiction*

The State sets up its jurisdictional argument by characterizing Quartez' statements at allocution as a motion for new trial based upon ineffective assistance of trial counsel. Then, it shoots down the "new trial motion" as untimely because it was made more than 14 days after the trial ended. See K.S.A. 2013 Supp. 22-3501(1) (new trial motion on any other grounds than newly discovered evidence must be filed within 14 days of verdict or finding of guilty). Curiously, the State's brief also points out the rather obvious circumstance that the timely filed new trial motion, prepared and filed by trial counsel, did not claim that the district court erred in not removing trial counsel. That would have certainly placed trial counsel in a conflicted posture.

Nevertheless, as we read the defendant's statements at sentencing, he is complaining that the district court refused to hear his pro se motion for new counsel,

12

which was timely filed, prior to trial. His complaint on appeal is that the district court failed to perform its duty to inquire into a potential conflict he had with his attorney, after being put on notice of the conflict by defendant's pro se motion. In recent direct appeals, this court has considered the issue of a trial court's duty to inquire into a potential attorney conflict. See, *e.g.*, *State v. Sharkey*, 299 Kan. 87, 322 P.3d 325 (2014); *Stovall*, 298 Kan. 362; *State v. Wells*, 297 Kan. 741, 305 P.3d 568 (2013). We see no jurisdictional impediment to do so again in this case.

*Failure to Inquire*

We begin by stating the well-known principle that both our federal and state constitutions guarantee the right of criminal defendants to have the assistance of counsel. That right to counsel "requires more than the presence of an attorney; it guarantees the right to *effective* assistance from the attorney." (Emphasis added.) *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012).

Yet, our constitutions do not guarantee the defendant the right to choose which attorney will be appointed to represent the defendant. If a defendant seeks substitute counsel, the defendant "must show 'justifiable dissatisfaction' with his or her appointed counsel," which can be "demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant." *Wells*, 297 Kan. at 754. The defendant bears the responsibility of providing "'an articulated statement of attorney dissatisfaction,'" which will, in turn, "'trigger the district court's *duty t*o inquire into a potential conflict'" of interest. (Emphasis added.) *Wells*, 297 Kan. at 755 (quoting *State v. Rand*, No. 106,774, 2012 WL 6634397, at *5 [Kan. App. 2012] [unpublished opinion]); see also *State v. Taylor*, 266 Kan. 967, 979, 975 P.2d 1196 (1999) (discussing *Wood v. Georgia*, 450 U.S. 261, 272, 101 S. Ct. 1097, 67 L. Ed. 2d 220 [1981], for proposition that district court aware of possible conflict of

interest between attorney and defendant charged with felony has "a duty to inquire further").

Here, Quartez' motion for new counsel contained sufficient information to trigger the district court's duty to make further inquiry. The record does not reflect that the district court even attempted to fulfill that duty.

To the contrary, Quartez' in-court statement suggesting that the judge *sua sponte* withdrew the motion without Quartez' consent and without his knowledge is the only statement before us as to what occurred. Contrary to the State's argument, we view the defense counsel's response—"Well, that's news to me, Judge"—as being ambiguous, at best, especially in the context of counsel's later statements. Interestingly, the sentencing transcript does not reflect that either the sentencing judge or the prosecutor attempted to refute Quartez' description of how his pro se motion for new counsel was handled. That description, in addition to raising due process concerns, obviously refutes the notion that the district court made the requisite inquiry into whether the alleged problems between Quartez and his attorney rose to the level of justifiable dissatisfaction. Moreover, when the court was given another opportunity to inquire during defendant's allocution at sentencing, the court actually *prevented* defendant from providing further information on the conflict by demanding that he not speak while the judge gratuitously and strenuously opined on trial counsel's virtues. We have recently found such a failure to inquire to be an abuse of discretion. See *State v. Sharkey*, 299 Kan. at 98 (district court abused its discretion by failing to make appropriate inquiry into potential conflict of interest); *Stovall*, 298 Kan. at 370 (district court abuses its discretion when it makes no inquiry into nature of conflict).

Quartez relies heavily on *State v. Vann*, 280 Kan. 782, 127 P.3d 307 (2006), where this court held that the trial court abused its discretion by failing to consider the

14

defendant's pretrial pro se motion to discharge counsel. Vann followed up with a letter to the clerk inquiring about the motion and later requested to proceed pro se, but he did not mention the motion for new counsel again until the hearing on his motion for new trial. The district court told Vann that he should have raised the new counsel issue when the court considered his other pro se pretrial motions. Vann complained again at sentencing, arguing that he could not have had a fair trial when he and his counsel had a conflict of interest. The district court ignored the complaint and proceeded to sentencing. The Court of Appeals similarly rejected Vann's arguments, ruling that Vann had multiple opportunities after he filed his pro se motion to discharge his counsel to bring the motion to the court's attention and failed to do so until posttrial, which the Court of Appeals deemed to be too late.

This court disagreed with the lower courts, finding that the district court knew of Vann's pretrial motion to discharge his counsel, his follow-up letter to the clerk, and his pretrial motion to proceed pro se, and that knowledge, together with the posttrial assertions of a conflict, rendered the court's failure to inquire an abuse of discretion requiring remand to the district court. *Vann*, 280 Kan. at 792. The State's attempt to distinguish *Vann* as a case involving the right to proceed pro se is unavailing. But we must clarify the portion of *Vann* that distinguished the prior Court of Appeals decision in *State v. Boyd*, 27 Kan. App. 2d 956, 965, 9 P.3d 1273, *rev. denied* 270 Kan. 900 (2000).

In *Boyd*, the Court of Appeals rejected Boyd's argument that the trial court violated his constitutional rights by ignoring his pro se pretrial motion to dismiss counsel, reasoning as follows:

> "There is nothing in the record to indicate that Boyd ever objected to the appearance of his trial counsel. Boyd appeared with his attorney at the motions hearing, the jury trial, the motion for new trial, and at sentencing. He had ample opportunity to

object to the presence of his attorney. Also, an issue not presented to the trial court, as is the case here, will not be considered for the first time on appeal." 27 Kan. App. 2d at 965.

*Vann* distinguished *Boyd* by noting that Vann had "raised the issue of his pro se motion for new counsel on repeated occasions before the district court." *Vann*, 280 Kan. at 790. While that factual distinction was present, we discern that *Boyd*'s rationale simply does not comport with our current decisions. A district court's duty to inquire into a potential attorney/client conflict emanates from its responsibility to assure that a defendant's constitutional right to effective assistance of counsel is honored. *Sharkey*, 299 Kan. at 96 (quoting *State v. Carter*, 284 Kan. 312, 321, 160 P.3d 457 [2007]). The duty to inquire accrues when the court first learns of the potential conflict, and that duty does not decay or dissipate just because a pro se defendant fails to give the court multiple reminders of its duty throughout the proceedings. As noted in *Wells*, what a defendant is obligated to do to invoke the trial court's duty to inquire is to provide an articulated statement of attorney dissatisfaction. 297 Kan. at 754. We decline to add a further requirement of repetitive notice.

We pause to clarify that we are not saying that a district court cannot permit a pro se movant to withdraw his or her motion for new counsel. But such a withdrawal must be the personal, voluntary, and knowing act of the defendant, and the record must reflect that circumstance. Otherwise, a district court receiving a motion for new counsel that contains an articulated statement of attorney dissatisfaction acquires the duty to make reasonable inquiry into the potential conflict of interest and the failure to do so constitutes an abuse of discretion. Moreover, after a defendant has triggered the district court's duty to inquire into a potential attorney/client conflict, the defendant does not thereafter waive his or her right to conflict-free counsel by failing to renew the motion for new counsel periodically throughout the proceedings.

16

Here, the record reflects that Quartez triggered the district court's duty to inquire into a potential attorney/client conflict with his pro se motion for new counsel. The record does not reflect that Quartez personally, voluntarily, and knowingly withdrew the motion, and the record does not reflect that the district court made an inquiry into the potential conflict of interest. Consequently, the district court abused its discretion.

On the other hand, as the State points out, this court is not in a position to make the factual findings that would be necessary to reverse Quartez' convictions. Without the district court's inquiry we do not have a suitable record on appeal to assess the alleged conflict of interest or to determine whether any conflict found to exist "'adversely affected his counsel's performance.'" *Vann*, 280 Kan. at 792 (quoting *State v. Gleason*, 277 Kan. 624, 653-54, 88 P.3d 218 [2004]). Therefore, we remand with instructions for the district court to conduct a hearing on Quartez' claim of attorney dissatisfaction, at which the defendant is to be represented by conflict-free counsel. At the conclusion of the hearing, the district court shall determine whether Quartez has established justifiable dissatisfaction with his counsel and whether that conflict adversely affected the adequacy of the attorney's representation.

SUFFICIENCY OF THE EVIDENCE

Quartez also argues that insufficient evidence supported his aggravated burglary, felony murder, and aggravated assault convictions. Notwithstanding our remand on the first issue, we must analyze the sufficiency issue to determine whether Quartez is entitled to an outright reversal.

*Standard of Review*

Our standard of review for sufficiency of the evidence challenges is well established:

17

"When the sufficiency of evidence is challenged in a criminal case, this court reviews all the evidence in the light most favorable to the prosecution in determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). In determining whether there is sufficient evidence to support a conviction, this court will not reweigh the evidence or reassess the credibility of the witnesses. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011)." *State v. Brown*, 298 Kan. 1040, 1054, 318 P.3d 1005 (2014).

*Aggravated Burglary*

One of Quartez' convictions was for aggravated burglary, which is defined in K.S.A. 21-3716 as "knowingly and without authority entering into or remaining within any building . . . in which there is a human being, with intent to commit a felony . . . therein." In this case, the jury was instructed that the State had to prove the following elements:

"1. That the defendant knowingly entered a building;
"2. *That the defendant did so without authority*;
"3. That the defendant did so with the intent to commit aggravated assault [against Bolden] a felony therein;
"4. That at the time there was a human being in the building; and
"5. That this act occurred on or about the 26th day of April, 2010, in Sedgwick County, Kansas." (Emphasis added.)

Quartez asserts that the State failed to present sufficient evidence to prove that his entry into Bolden's apartment was without authority. Quartez points to *State v. Harper*, 246 Kan. 14, 25-26, 785 P.2d 1341 (1990), where this court found that the legislature intended "entry without authority and entry with intent to commit a felony or theft to be

18

two separate elements." While *Harper*'s legal holding is applicable here, the factual differences in this case do not mandate the same result.

In *Harper*, the defendant had an "extremely broad grant of authority to enter and use" the office at a softball complex where he worked. 246 Kan. at 25. Specifically, Harper had a key to the office and authority to enter the office for his duties as the complex's groundskeeper, in his role as umpire, for the construction work he was contracted to perform for the complex, and when he had too much to drink to drive home. The *Harper* court found that because he had authority to enter the building, he could not be convicted of burglary even though he did not have permission to take the records he was in the office to obtain. The court reasoned that Harper's authority to enter the office was not negated even where his entry was for an unlawful purpose. 246 Kan. at 20.

Quartez argues that his authority to enter the apartment emanated from the fact that Bolden did not lock the door to his apartment and did not even have a key to the entry door. Apparently, Quartez believes that an unlocked entry door is an invitation for anyone to walk into the abode unannounced at any time. One can only imagine the euphoria among members of law enforcement upon learning that an unlocked apartment door provides them with the authority to enter at will. Of course, such a ludicrous proposition does not comport with either common sense or the law. Any rational person should know that, without more, a closed door at a residence—whether locked or not—signals the need to obtain permission to enter. Legally, our legislature "eliminated the common-law requirement that a burglary involve a 'breaking.'" *State v. Storey*, 286 Kan. 7, 12, 179 P.3d 1137 (2008) (citing Judicial Council Comment, 1968, to K.S.A. 21-3716 [Weeks]); see also 3 Wharton's Criminal Law §§ 317-318 (15th ed. 1995) ("There is an actual break if the defendant makes an opening in the dwelling house, *i.e.*, he removes some obstruction in order to enter. . . . It is enough merely that he open a closed but

19

unlocked door."). Here, Green testified that Quartez and Brown opened the door to enter the apartment unannounced and without permission.

Quartez also argues that he had apparent permission to enter the apartment, based upon: (1) Watley's testimony that people came and went as they pleased from Bolden's apartment and people "crashed" there; and (2) Green's testimony that she initially thought Quartez and Brown were playing a joke on Bolden. Again, we reject the premise. Granting *some people* permission to enter the apartment at will does not imply that *all persons* have the same authority. See *State v. Fondren*, 11 Kan. App. 2d 309, 315-16, 721 P.2d 284 (discussing implied and express authority with respect to school building), *rev. denied* 240 Kan. 805 (1986).

Here, viewing the evidence in the light most favorable to the State, the Brown cousins did not have either express or implied authority to enter Bolden's apartment. Bonner testified that she did not believe that the cousins had permission to enter the apartment and Bolden did not invite them in. Bonner further explained that prior to the early morning in question, she had never been to Bolden's apartment and, to her knowledge, Brown and Bolden were not friends and the Brown cousins had not previously been to Bolden's apartment. The evidence that other people freely entered and left Bolden's apartment did not establish an implied authority for strangers to enter the apartment uninvited. Consequently, we find that the State presented sufficient evidence to establish all of the elements of aggravated burglary.

*Felony Murder*

Quartez next argues that the State presented insufficient evidence to support his felony-murder conviction because the evidence was insufficient to support the underlying felony of aggravated burglary. We can dispose of this issue forthwith.

20

First, the State was not required to prove that Quartez was convicted of the aggravated burglary, just that the killing was done while he was in the commission of the underlying felony. See *State v. Wise*, 237 Kan. 117, 122-23, 697 P.2d 1295 (1985) (completion of underlying felony not essential element of felony murder; acquittal of underlying felony not inconsistent with felony-murder conviction). Nevertheless, the simple answer is that the State did present sufficient evidence of the underlying felony, so that the evidence was sufficient for the felony-murder conviction, as well.

*Aggravated Assault*

Quartez' final sufficiency of the evidence challenge is to his conviction for the aggravated assault against Ashley Green. Aggravated assault under K.S.A. 21-3408 and K.S.A. 21-3410(a) "is intentionally placing another person in reasonable apprehension of immediate bodily harm" committed with a deadly weapon. Quartez argues the State did not prove Green was in immediate apprehension of bodily harm. See *Spencer v. State*, 264 Kan. 4, 6, 954 P.2d 1088 (1998) ("[T]here can be no crime of assault without apprehension by the victim of bodily harm.").

Quartez argues Green's direct examination established that she was not afraid until after the threat to her had passed. The following exchange occurred after Green described the shooting:

> "[Prosecution] Q. Okay. What were you doing this whole time?
> "A. On the floor, covering my eyes, praying, head down.
> "Q. Were you—this may seem like a silly question, but were you afraid?
> "A. Yes."

21

Quartez also argues that Green's cross-examination established that Green thought that the Brown cousins were friends of Bolden's, did not threaten her, and did not seem interested in her. Quartez' argument is based upon the following exchange:

"[Defense counsel] Q. After the two guys came in, it appeared to you that they weren't even interested in you, didn't it?

"A. I don't know.

"Q. I mean, they told you to get down and they went into Otis's room?

"A. Yeah.

"Q. They didn't even threaten you, did they?

"A. No. I mean—

"Q. You even told the detective that you thought initially they were his friends, didn't you?

"A. (Witness nodding head.) Yeah.

"Q. And why did you think that?

"A. I thought they was playing. I didn't know.

"Q. So—

"A. I didn't know. I didn't know. I thought they was playing. I didn't know that— I don't know.

"Q. Were those the kind of friends that Otis would have as somebody that would come into his house, carrying guns?

"A. I don't know.

"Q. But that's what you thought, they could be his friends?

"A. I don't know."

On redirect examination, the prosecutor asked Green: "[Defense counsel] asked you did they ever threaten you. Did the two people who came in the apartment point their guns at you?" Green responded: "That's considered a threat to me."

Quartez relies on *State v. Warbritton*, 215 Kan. 534, 527 P.2d 1050 (1974), in which the defendant was convicted of aggravated assault for pointing a gun at his mother-

22

in-law, after he had shot his wife. The mother-in-law was holding the defendant's baby and testified that she did not fear for her own safety because she thought Warbritton would hit the baby first if he shot and would not hurt her. A majority of this court reversed the aggravated assault conviction because the victim's testimony negated the element that she be placed in immediate apprehension of harm to herself. 215 Kan. at 538.

Without commenting further on the *Warbritton* opinion, we find that the facts presented here are more akin to those in *State v. Lessley*, 271 Kan. 780, 26 P.3d 620 (2001). There, Lessley confronted his ex-girlfriend, Lisa Sears, with a gun in an apartment complex parking lot. During the confrontation, Sarah and Darrell Blackman drove toward Lessley and Sears. Sears blocked the path of the Blackmans' car and asked them to stop. Sarah rolled down the car window, and Sears pleaded with the Blackmans not to drive away. Lessley showed Sarah his gun and told the Blackmans to continue driving. After the Blackmans drove away, Lessley shot and killed Sears.

On appeal, Lessley argued *Warbritton* entitled him to relief because the State did not present sufficient evidence that Sarah was placed in immediate apprehension of bodily harm. Lessley relied upon Sarah's testimony during cross-examination that she did not feel threatened as long as she did not get involved. She explained on redirect examination that she felt if she and her husband got involved, their lives would be at stake and that she felt threatened. On recross-examination, Sarah agreed that Lessley had not verbally threatened her life and "'[h]arm was not being immediately threatened against' her." 271 Kan. at 788.

After discussing both the majority and dissent in *Warbritton*, the *Lessley* majority concluded that despite Sarah's testimony that she did not feel threatened as long as she complied with Lessley's demands, "Sarah obviously had great fear for her safety and

well-being." 271 Kan. at 790. The majority focused on the evidence establishing that Sarah was less than 3 feet from a man with a gun, panicked when she saw the gun and asked her husband to keep driving, and was hysterical while she and her husband looked for a telephone to call for help. The dissent focused on the notion that Sarah did not feel threatened if she complied with Lessley's demands. 271 Kan. at 800 (Allegrucci, J., dissenting).

Similarly, in *State v. Hurt*, 278 Kan. 676, 688-89, 101 P.3d 1249 (2004), this court found sufficient evidence to establish reasonable apprehension of immediate bodily harm notwithstanding some inconsistent testimony from the victim. Pointedly, in *Hurt*, the victim ran away when Hurt pointed a gun at him and then Hurt fired the weapon at the victim as he ran away. Certainly, the victim's actions were most consistent with his testimony that he was scared when he ran away from the gun and the shots.

Unlike in *Warbritton*, we are not faced with unequivocal testimony that Green was not afraid for herself. See 215 Kan. at 537-38. At most, the defendant can point to some inconsistencies in the victim's testimony, as in *Lessley* and *Hurt*. Although Green testified that she initially thought the men might be playing a joke on Bolden, she clearly said that she considered it a threat when they pointed the guns at her. Moreover, if she were not afraid, why did she immediately comply with the armed men's demand to get on the ground? If a person complies with a demand made at gunpoint, it is logical to infer that the compliance was motivated by a fear of bodily harm. If Green truly did not experience an apprehension of immediate bodily harm, she would not have hit the ground and given up the location of Bolden. See *State v. Nelson*, 224 Kan. 95, 96, 577 P.2d 1178 (1978) (noting that circumstantial evidence can establish victim's fear of bodily harm); see also *State v. Powell*, 266 Kan. 282, 291, 971 P.2d 340 (1998) (noting that because the *Warbritton* opinion did not discuss circumstantial evidence, this court must assume there

was none). The evidence was sufficient to support the jury's conviction for aggravated assault.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Quartez next contends that the district court erred in denying his requested lesser included offense instructions on voluntary manslaughter, reckless second-degree murder, and involuntary manslaughter. Obviously, if the district court determines, after conducting the aforementioned hearing with conflict-free defense counsel, that a conflict existed between Quartez and his trial counsel that adversely affected the adequacy of trial counsel's representation, the district court will order a new trial and the instruction issues presented in this appeal will be moot. But we proceed to determine whether the instruction issues provide an independent basis for ordering a new trial for Quartez as a prophylactic measure against the possibility that the district court would determine that the conflicted counsel issue did not warrant a new trial, standing alone. *Cf. State v. Sharkey*, 299 Kan. 87, 101, 322 P.3d 325 (2014) (clarifying that a new trial contingent on district court's decision at remand hearing on ineffectiveness of counsel).

*Standard of Review*

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292

Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Voluntary Manslaughter*

There is no dispute that Quartez properly preserved this issue for appellate review by requesting a voluntary manslaughter instruction as a lesser included offense of second-degree murder. The requested instruction was also legally appropriate. This court has "held on numerous occasions that voluntary manslaughter is a lesser included offense of both first- and second-degree murder as a 'lesser degree' of those crimes under K.S.A. 21-3107(2)(a)." *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

Even if an instruction is legally appropriate, the instruction is only required when "'there is some evidence which would reasonably justify a conviction of [the lesser included offense.]'" *Plummer*, 295 Kan. at 161 (quoting K.S.A. 22-3414[3]). Where, as here, the defendant has requested the instruction, the evidence is viewed in the light most favorable to the defendant. 295 Kan. at 162. But this court still gives deference to the district court, in that this court does not reweigh the evidence or pass on witness credibility. 295 Kan. at 162.

Under the theory propounded by Quartez on appeal, voluntary manslaughter required the "intentional killing of a human being committed: (a) Upon a sudden quarrel or in the heat of passion." K.S.A. 21-3403. The key elements of voluntary manslaughter under K.S.A. 21-3403(a) are (1) an intentional killing, and (2) legally sufficient provocation. *State v. Foster*, 290 Kan. 696, 711, 233 P.3d 265 (2010) (citing *Gallegos*, 286 Kan. at 874). Quartez argues that the jury could have concluded the killing was intentional, but was a result of heat of passion.

26

"In order for a defendant to be entitled to a reduced charge because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting *sufficient provocation*." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). "Heat of passion" is "any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection." 236 Kan. at 796; see also *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 (2012) ("The hallmark of heat of passion is taking action upon impulse without reflection.").

Quartez relies on the reports of sexual assault by Bonner and Williams as the provocation for the Brown cousins' attack on Bolden. We find Quartez' argument to be unavailing for at least two reasons: The evidence did not establish that Quartez' emotional state reached the level to be described as a heat of passion; and, even if the alleged provocation initially generated a heat of passion, there was a sufficient cooling-off period to preclude the defense.

First, Quartez cannot point to any evidence that he experienced an intense or vehement emotional excitement. To the contrary, Evans testified that although Brown was visibly upset, Quartez was not. She testified that she did not see Quartez get mad or yell. Bonner testified that at the Glendale house, she told the Brown cousins that they should fight Bolden, but neither agreed to do anything. She explained that on the way to Bolden's house, the group simply listened to music and did not discuss what was going to happen once they arrived.

Additionally, even if Quartez could clear the first hurdle of establishing that he was provoked into a state of emotional excitement, he had an adequate opportunity to cool down and regain his composure before entering Bolden's apartment. The State points

27

to *State v. Henson*, 287 Kan. 574, 197 P.3d 456 (2008), where we found that a voluntary manslaughter instruction was not warranted where 20 to 30 minutes separated the provocation of the victim punching the defendant and the act of shooting the victim. The defendant had not immediately reacted to being hit, but instead drove home with a friend, cleaned himself up, got his gun, talked to his wife, introduced his wife to his friend, and drove back to the garage before he shot and killed the victim. Although recognizing that a reasonable cooling off period is not set by rule, we found "'[a]n act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than heat of passion.'" 287 Kan. at 583 (quoting *State v. Follin*, 263 Kan. 28, 38, 947 P.2d 8 [1997]).

Viewing the evidence in a light most favorable to Quartez, we will assume Quartez did not learn about the assaults until he arrived at the Glendale house at around 10:30 a.m. Accordingly, approximately 30 minutes passed before the group left the Glendale house to go to Drop's house. The Brown cousins were in Drop's house for approximately another 5 minutes. The group then drove to Bolden's house, where Quartez backed into a parking spot. Quartez and Brown entered Bolden's apartment and interacted with Green shortly after 11 a.m. As in *Henson*, we find that even if Quartez was still angry, he had control of his actions. Therefore, the district court did not err in declining to instruct the jury on voluntary manslaughter.

*Reckless Second-Degree Murder and Involuntary Manslaughter*

There is no dispute that Quartez properly preserved this issue for appellate review by requesting the lesser included offense instructions of reckless second-degree murder and involuntary manslaughter. The requested instructions were also legally appropriate. See *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005). But, as with voluntary manslaughter, Quartez is unable to show that "'there is some evidence which would

28

reasonably justify a conviction of [the lesser included offenses.]'" *Plummer*, 295 Kan. at 161 (quoting K.S.A. 22-3414[3]).

In order to be entitled to instructions upon unintentional but reckless second-degree murder and involuntary manslaughter, there must be "evidence to support a finding that the killing was unintentional." *State v. McCullough*, 293 Kan. 970, 979, 270 P.3d 1142 (2012). Unintentional but reckless second-degree murder is "the killing of a human being committed: . . . (b) *unintentionally* but recklessly under circumstances manifesting extreme indifference to the value of human life." (Emphasis added.) K.S.A. 21-3402(b). Reckless involuntary manslaughter is an unintentional killing committed recklessly. K.S.A. 21-3404(a). Reckless involuntary manslaughter differs from unintentional but reckless second-degree murder "only in the degree of recklessness required to prove culpability." *Engelhardt*, 280 Kan. at 135.

In denying the requested instruction, the district court relied on *State v. Bailey*, 263 Kan. 685, 690, 952 P.2d 1289 (1998), where this court found that neither Kansas caselaw nor legislative history supported the defendant's argument "that an intentional act done without regard to the consequences is reckless." Subsequently, however, in *State v. Deal*, 293 Kan. 872, 885, 269 P.3d 1282 (2012), this court opined that *Bailey*'s focus "on whether the conduct was intentional rather than whether the killing was intended" was not the correct interpretation of K.S.A. 21-3402. Rather, "K.S.A. 21-3402 focuses culpability on whether a killing is intentional or unintentional, not on whether a deliberate and voluntary act leads to death." 293 Kan. at 885.

At the time of Bolden's death, K.S.A. 21-3201(c) defined reckless conduct as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." In *Deal*, we found "an unintentional but reckless second-degree murder . . . is a killing of a human

29

that is not purposeful, willful, or knowing but which results from an act performed with knowledge the victim is in imminent danger, although death *is not foreseen*." (Emphasis added.) *Deal*, 293 Kan. at 884.

Despite the district court's reliance on *Bailey*, the district court's reasoning supports the notion that Quartez intended the result that occurred:

> "[T]he acts in this case where defendant pointed the gun, I guess we could differ as to what point blank range is, but certainly it wasn't at a distance. It was at close range, six to ten feet, and pointed the gun and shot. I don't think those facts show reckless conduct but intentional conduct."

Quartez compares his case to *State v. Cordray*, 277 Kan. 43, 55-56, 82 P.3d 503 (2004), where the evidence was held sufficient to support a reckless second-degree murder conviction. There, Cordray killed a car's occupant when he fired seven "warning shots" in the direction of a car he knew was occupied. This court found the evidence sufficient to support extreme recklessness even though Cordray did not intend to kill any of the car's passengers and presented evidence that his shots did not go where he intended. 277 Kan. at 56. Quartez argues his case is similar because he and Brown participated in "shooting *into* Bolden's bedroom, that they knew to be occupied." (Emphasis added.)

As the State points out, Quartez' argument mischaracterizes the evidence because all the bullet casings and Quartez' earbud were found *within* Bolden's bedroom. The evidence established that the Brown cousins entered Bolden's house, immediately asked where Bolden was, went into Bolden's room, and shot Bolden multiple times from inside the bedroom. The evidence showed that the majority of Bolden's entry bullet wounds

30

were on the back side of his body, indicating Bolden was shot as he fled through the window.

Even if one could discern some evidence to support recklessness in the shooting of the victim in the back, there is no possibility that the jury would have reached a different verdict if it had been given the options of reckless second-degree murder or involuntary manslaughter. Accordingly, any error in refusing those lesser included offenses would be harmless error.

NUNC PRO TUNC ORDER TO CORRECT THE JOURNAL ENTRY OF JUDGMENT

Quartez points out that the journal entry of judgment incorrectly describes Quartez' second-degree murder conviction as an "off-grid" severity level crime, when that crime is actually a severity level 1, person felony. K.S.A. 21-3402. The State concedes the error. Accordingly, we remand for a nunc pro tunc correction. See K.S.A. 22-3504(2).

CRIMINAL HISTORY SCORE

Quartez finally argues that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated because the State did not include Quartez' prior convictions in the complaint or prove those convictions to the jury beyond a reasonable doubt. The State points out that Quartez did not raise this issue to the district court. Quartez agreed with his criminal history score and did not protest its use at sentencing. Issues not raised to the district court may not be raised on appeal. *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007). Moreover, we decline to reconsider our well-settled law that refutes Quartez' argument. See *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002).

31

CONCLUSION

We remand to the district court with instructions to: (1) Conduct a hearing on Quartez' claim of attorney dissatisfaction, at which the defendant is to be represented by conflict-free counsel; and (2) correct the journal entry of judgment to reflect that second-degree intentional murder is a severity level 1 offense.

Reversed and remanded with directions.

MORITZ, J., not participating.

DAVID J. KING, District Judge, assigned.[1]

[1]**REPORTER'S NOTE:** District Judge King was appointed to hear case No. 106,894 vice Justice Moritz pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.