NOT DESIGNATED FOR PUBLICATION

No. 128,457

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PATRICIA ECHOLS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SEAN M.A. HATFIELD, judge. Submitted without oral argument. Opinion filed June 5, 2026. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Daniel Wells*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and ATCHESON, JJ.

PER CURIAM: Patricia Echols appeals her conviction of aggravated assault. Her sole argument on appeal is that the evidence fails to prove that the victim had a reasonable apprehension of immediate bodily harm, as is necessary for aggravated assault. After careful review, we affirm.

1

Echols and Deadria Adams knew each other for approximately a decade and lived across the street from each other in Wichita, but, as Echols remarks, the two were not neighborly.

On October 21, 2023, Adams walked across the street towards Echols' next door neighbor's house and arrived in the neighbor's driveway. Echols then approached less than five feet from where Adams was standing and "pull[ed] this gun out [of] [a] bag and pointed it dead" at Adams. Trial testimony confirmed that Echols pointed the gun towards Adams' chest or head.

As she was drawing the gun, Echols said to Adams, "I told you you can't come visit anybody on this side of the street." Adams responded by yelling to ask her cousin to call the police. Adams said she retreated and took cover behind a vehicle because, "in my mind, if I get behind this car and she's still shooting, she can—I will at least be protected a little bit." After making it around the vehicle, Adams fled to her house, kicking her sandals off so she could run faster. Adams testified, "I was devastated, scared for my life." When she was asked whether she thought that Echols was going to use the gun on her, Adams recalled feeling "like [Echols] was going to use it. Why else would you pull a gun on somebody?"

Although she had asked her cousin to call 911, Adams called 911 herself when she reached her house. She also put on a new pair of shoes because Adams "knew [Echols] had kept my shoe in her yard. I wasn't going in there to get it." Adams was "shocked," "scared," "devastated," "blown away," and in a state of disbelief when Echols pulled a gun on her. But she also knew of Echols' reputation and had previously called Echols by her street name—"pistol packing Pat."

Tamara Green, Adams' cousin, witnessed the encounter between Echols and Adams. Green testified that she watched Adams cross the street to visit a neighbor and saw Echols come out of her house "waving the gun around." Green heard Echols warn Adams that she was not allowed to visit Echols' side of the street. As soon as Adams saw the gun, the two began exchanging words. Seeing the volatile situation developing, Green called 911. Green's 911 call was played for the jury.

Indira Henry lived down the street from Adams and Echols. On the day of the altercation she was sitting on her front porch when she saw Echols warn Adams that she was not supposed to be on Echols' side of the street, but Adams responded to Echols that she could do whatever she wanted to do. Henry recalled seeing Echols with her arms outstretched in Adams' direction and hearing Adams asking Echols, "[D]o you have a gun? If you're going to shoot me, do it." Henry testified that she witnessed Adams walking back to her own yard after Echols went back inside her own house.

Renay Bryand, an officer with the Wichita Police Department, responded to the scene, among other officers. Adams told Bryand that she was going across the street to visit with a neighbor when Echols came out of her house and told her she was not allowed to visit people on that side of the street. Adams told Bryand that Echols then pulled out a gun and warned Adams that she would "fuck her up" unless Adams returned to her side of the street. Adams told officers that Echols took a shooting stance, pointed the gun directly at her chest from about four feet away, and warned Adams that if she took another step she was "gone."

Adams told the officers that Echols did not pursue her when she ran, but instead Echols walked away and returned to her house on the opposite side of the street. In her narrative to the officers, Adams said upon seeing Echols return to her house, she returned to her yard and called 911.

3

After Echols was arrested, officers searched her house and found a handgun on an end table in her living room. In the trunk of her car, parked in her garage, officers found a loaded magazine for that gun. Officers did not find any bullets in the house and Echols told officers the magazine was in the trunk of her car during her encounter with Adams.

The State charged Echols with one count of aggravated assault, in violation of K.S.A. 21-5412(b)(1), which carried a disposition of presumptive prison because the offense was committed with a firearm. See K.S.A. 21-6804(h). The jury found Echols guilty as charged. The district court granted Echols an optional nonprison sentence and sentenced her to 24 months' probation with an underlying prison term of 11 months.

Echols timely appeals her conviction.

DID SUFFICIENT EVIDENCE SUPPORT ECHOLS' AGGRAVATED ASSAULT CONVICTION?

Echols argues solely that insufficient evidence supports her conviction for aggravated assault because the evidence failed to prove that Adams had a reasonable apprehension of immediate bodily harm. Echols' conviction of aggravated assault required the State to prove that Echols knowingly placed Adams in "reasonable apprehension of immediate bodily harm" and did so with a deadly weapon. See K.S.A. 21-5412(b)(1). Echols contends that Adams' behavior during the encounter disproves such fear.

When an appellant challenges the sufficiency of the evidence supporting his or her conviction, "we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

"It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022). And a conviction of even the greatest offense can be supported by circumstantial evidence as long as that evidence allows a factfinder to find the elements beyond a reasonable doubt. To sufficiently support the conviction, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Barnes*, 320 Kan. 147, 177-78, 563 P.3d 1255 (2025).

Circumstantial evidence of a victim's actions can establish reasonable apprehension of immediate bodily harm. That was the case in *State v. Brown*, 300 Kan. 565, 584, 331 P.3d 797 (2014), where the Kansas Supreme Court found these facts enough to convict for aggravated assault:

> "Although [the victim] testified that she initially thought the men might be playing a joke on [a separate person], she clearly said that she considered it a threat when they pointed the guns at her. Moreover, if she were not afraid, why did she immediately comply with the armed men's demand to get on the ground? If a person complies with a demand made at gunpoint, it is logical to infer that the compliance was motivated by a fear of bodily harm. If [the victim] truly did not experience an apprehension of immediate bodily harm, she would not have hit the ground and given up the location of [the other person]."

Reasonable apprehension of immediate bodily harm may be shown even when the victim never testified that he or she feared for his or her well-being. See *State v. Albert*, No. 121,915, 2021 WL 1149150, at *4 (Kan. App. 2021) (unpublished opinion). In *Albert*, another panel of this court found sufficient evidence to support a conviction of aggravated assault. In that case, evidence showed that while standing in the driveway, Albert "first displayed the gun in his waistband and then aimed it directly at [the victim] from a short distance." 2021 WL 1149150, at *4. The victim "felt something bad was about to happen" and tried to protect himself by placing his arms in front of his body where the gun was aimed. 2021 WL 1149150, at *4. The victim never testified that he

feared for his well-being and gave inconsistent statements about his reasonable apprehension of immediate bodily harm. Despite that, the *Albert* panel affirmed the conviction for aggravated assault based on circumstantial evidence that the victim was placed in reasonable apprehension of immediate bodily harm. A reasonable conclusion from the victim's actions was that he was acting out of fear of being shot. 2021 WL 1149150, at *4.

Likewise, a victim's fear can be imputed from the circumstances. For example, in *State v. Hurt*, 278 Kan. 676, 688-89, 101 P.3d 1249 (2004), the Kansas Supreme Court found sufficient evidence to establish reasonable apprehension of immediate bodily harm despite inconsistent testimony from the victim. There, the victim ran away when Hurt pointed a gun at him and then fired the weapon at him as he ran away. Testimony showed that the victim was scared when running away. 278 Kan. at 688-89.

To show Adams was not scared by seeing the gun, Echols points to the combative statements Adams made in response to seeing the gun, as captured in Green's call to 911. On cross-examination, Green and Adams were asked about the 911 call Green made during the incident. They testified that during that call, Adams could be heard issuing threats and swearing at Echols. Adams told Echols, "Now put your gun down so I can beat your ass," and threatening to tase Echols' "bitch ass." Adams also can be heard saying to Echols, "scary ass bitch can't fight, you've got to pull your goddamn pistol." Adams said at trial she was "[j]ust talking off my mouth." Adams and Echols continued to verbally spar back and forth and Adams told Echols to "[c]ome on in my yard, come on in my yard, bitch, so I can beat your ass." Adams added "don't pull a gun out on me and not use it," and lamented "I should have stomped on your ass and made you shoot me."

But the 911 calls are not included in the record on appeal. Although we have some witness testimony about some dialogue, we lack the entire audio. Still, the testimony

about Adams' comments to Echols creates some conflicting evidence about Adams' level of apprehension. But weighing the testimony about Green's 911 call against Adams' testimony that she feared for her life is a factfinding exercise this court does not engage in. See *Mendez*, 319 Kan. at 723. The jury heard the 911 calls and all other conflicting testimony, and their verdict reflects that they credited Adams' testimony more than Echols'.

Adams testified that she feared imminent bodily harm from Echols. She testified that when Echols pointed the gun at her, she was scared for her life, and she felt that Echols was going to use the gun on her. Her actions reflected that fear, as she immediately took cover behind a car, kicked off her shoes so she could run faster to safety, and then called 911. The facts thus show that Adams had a subjective apprehension of immediate bodily harm. Adams' apprehension of that harm was also objectively reasonable—one a reasonable person would share. Having a person make a threat and point a weapon that could be loaded would naturally evoke fear in a reasonable person who was targeted at a range of four or five feet.

Viewing the evidence in the light most favorable to the State, we find sufficient evidence supporting Echols' conviction for aggravated assault.

Affirmed.